UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-10581-RGS

HERBY CAILLOT,
Petitioner,

v.

BRUCE GELB,
Respondent.

REPORT AND RECOMMENDATION ON
PETITION UNDER 28 U.S.C. § 2254
FOR A WRIT OF HABEAS CORPUS (#1).

KELLEY, U.S.M.J.

## I. INTRODUCTION

Herby Caillot, convicted of first-degree murder, petitions for a writ of

habeas corpus under 28 U.S.C. § 2254.  Caillot, having successfully navigated the

demanding requirements of § 2254 concerning time limits and exhaustion of

issues, raises six constitutional claims, the strongest of which bears mention at the

outset of this Report and Recommendation.  He asserts that the Supreme Judicial

Court erred in finding that his rights under the Confrontation Clause were not

violated by the admission of his non-testifying codefendant's statements, even

though the prosecutor urged the jury to find that the statements established

Caillot's motive for the crime, and even though the trial court gave no limiting

instructions concerning the statements.  For the reasons that follow, I find that the

Supreme Judicial Court's decision was based on an unreasonable determination of

facts in light of the evidence presented; that the decision was an unreasonable

application of clearly established federal law, namely, Supreme Court precedent

under *Crawford v. Washington*, 541 U.S. 36 (2004) and *Tennessee v. Street*, 471

U.S. 409 (1985); and that the error had "substantial and injurious effect" on the

jury's verdict.  I therefore recommend that the petition be allowed.

## II. BACKGROUND

### A.    Factual Background

On October 5, 1998, a jury convicted Herby Caillot and his codefendant,

Manuel R. Santos, of murder in the first degree by reason of deliberate

premeditation.  *Commonwealth v. Caillot*, 454 Mass. 245, 246 (2009) ("*Caillot*

*II*").  *See* p. 8.  Both men were sentenced to life in prison without the possibility of

parole.[1] (Tr. 11 at 11.)

---

[1] Caillot was a juvenile at the time of the crime.  In 2012 the Supreme Court, in *Miller v. Alabama,* __ U.S. __, 132 S. Ct. 2455 (2012), held that mandatory life imprisonment without parole for those who are juveniles (under age 18) at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishment.  Based on this holding, in 2012 Petitioner moved to stay his appellate proceedings.  Eventually his sentence was vacated and he was resentenced to a term of life with the possibility of parole after fifteen years.  (#38 at 7.)

The facts below are taken from the opinion of the Supreme Judicial Court ("SJC")

in *Caillot II*, 454 Mass. at 247-52.[2]

> The jury could have found that, at approximately 5:45
> p.m. on November 19, 1996, Desmond Campbell was
> standing with his girl friend on the front steps of the three
> family house in which he lived at 46 Winthrop Street in
> Brockton, on the corner of Winthrop Street and Warren
> Avenue, when he observed a green automobile similar to
> a Dodge Stratus drive by and stop outside his house
> behind a bus.[3] He observed a black male in the passenger
> seat staring at him.  The same automobile passed by a
> few minutes later.  A minute or two later, Desmond[4] saw
> a black male who was approximately six feet tall and
> who was wearing a black coat, a dark 'hoodie' (hooded
> sweatshirt), blue jeans, and black boots climb down a
> wall at the nearby house at 451 Warren Avenue.  The
> man went to a white van that was parked in front of the
> house.  Two other men ran behind the van.  Fearing that
> they were enemies (although he did not recognize anyone
> in the automobile), because he had gotten into many
> fights in Brockton, he grabbed his girl friend and went
> into his younger brother Daryl's bedroom on the second
> floor.  He told Daryl that there were three males across
> the street.  Daryl opened the bedroom window to see who
> was outside, and immediately heard the sound of multiple
> gunshots.

---

[2] In the analysis that follows the facts will be supplemented by other consistent facts from
the record.  *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 62 (1st Cir. 2009).

[3] The SJC inserted a footnote which states "[t]here was evidence that a Dodge Stratus is
very similar in appearance to a Chrysler Cirrus and a Plymouth Breeze.  There was also evidence
that he described the automobile differently on different occasions, one time referring to the
automobile as a 'green Dodge Stratus or Chrysler Cirrus,' and another time solely as a 'green
Dodge Stratus-like vehicle.'"

[4] The SJC inserted a footnote which states "[w]e use first names where there are multiple
witnesses with the same surname."

After the shooting stopped, Daryl looked out the window and saw two of the men, both dark skinned and wearing black clothing (one wearing a hoodie), get into a green automobile parked up the street. One man got into the front passenger seat, and the other got into the back seat behind the driver.  The automobile drove off down Winthrop Street.  The police later recovered twenty discharged nine millimeter cartridge casings from the lawn of 451 Warren Avenue.  No one was injured during the shooting.

Desmond's aunt, Phyllis Murphy, and her boy friend lived in the first-floor apartment at 46 Winthrop Street. Teriell Murphy and Delicia Turner are Phyllis's children. The father of Turner's child was Carlo Clermy, the victim.

Turner quickly telephoned Teriell.  As a result of the telephone call, Teriell and the victim drove to 46 Winthrop Street in Turner's automobile, a light blue Honda.  When they arrived, the police were already there.  They spoke with some of their relatives about what had occurred, and departed in the Honda. They drove around Brockton, angry, upset, and eager to retaliate.

The victim was driving.  While heading west on Nilsson Street, he stopped at a stop sign at the intersection of Nilsson and Warren Avenue, about one-half mile from 46 Winthrop Street.  As Teriell was trying to light a 'blunt' (marijuana cigar), a white tow truck hauling a station wagon came around the corner.  A light green, four-door Chrysler Cirrus then followed the tow truck around the corner, to the left of the Honda, shining its headlights on the Honda.  The Chrysler stopped, and the rear door on the driver's side opened.  Teriell ducked down and slouched in his seat, and heard multiple gunshots.  The driver's side window of the Honda blew out, followed by the passenger's side window, and glass shattered all

around. The victim was shot. The Honda drifted forward and to the left, and crashed into a utility pole.

Teriell grabbed a nine millimeter semiautomatic pistol from the victim's waist area and got out of the automobile. Teriell saw a shadowy figure wearing dark clothing getting into the back seat of the Chrysler behind the driver. The Chrysler drove away, traveling east on Nilsson Street. Teriell chased on foot after the automobile, attempting to shoot at it, but the gun would not fire because the safety was on. Teriell 'cocked the hammer' and a bullet fell to the ground. Teriell repeatedly fired at the Chrysler, shooting until he had no ammunition left. The Chrysler passed the tow truck in front of it, at which time Teriell stopped shooting. He left the gun near a shed behind a variety store and returned to the Honda.[5] Police arrived at the scene at approximately 6:16 p.m. The victim died as a result of gunshot wounds to his neck and back.

Officer Thomas M. Spillane of Brockton police department promptly arrived at the scene and asked Teriell, who was shaking and appeared disoriented, what had happened. Teriell said he did not know; '[s]omebody just started shooting at us.'

While Officer Spillane was securing the scene, he was directed to go to Good Samaritan Hospital in Brockton, approximately three miles away, arriving there at approximately 6:40 p.m. Outside the entrance to the emergency room, Officer Spillane observed a green, four-door Chrysler Cirrus parked in a spot designated for handicapped drivers. The rear driver's side window and rear passenger's side window were gone, there was glass inside the automobile, and there was blood on the rear seat and carpet.

---

[5] The SJC inserted a footnote which stated "[w]hen the police later returned to the scene with Teriell to retrieve the gun he had left there, they could not find it."

Hospital personnel directed Officer Spillane to one of the defendants, Manuel Santos, who was wearing a dark hoodie and standing near the main door of the emergency room.  Santos admitted that he had been driving the green Chrysler Cirrus parked outside of the emergency room. He stated that he had been heading south on Main Street when someone tried to carjack him.  Santos explained that someone had started shooting at him during the attempted carjacking, and he had brought his friend Caillot to the emergency room.  Officer Spillane brought Santos outside to two other police officers, and told them to handcuff him and place him in the police cruiser.  One of the officers gave Santos Miranda warnings, which Santos said he understood, and then handcuffed Santos and placed him in custody in the back seat of the police cruiser.  While walking to the cruiser, Santos told the officers that he 'didn't do anything,' but knew who did, that he had been carjacked, and asked to speak with a particular Brockton police detective, who was on his day off.  The officer turned the radio inside the cruiser off after placing Santos in the back seat.  A few moments later, Santos knocked on the cruiser door, and when the officer opened the front driver's door, Santos asked 'What do you think, I murdered someone?'  At the time, that officer was not aware that anyone had been killed. She told Santos that the detectives would talk to him.

A few minutes later, Detective Arthur McLaren of the Brockton police department arrived.  He turned off his portable radio and joined Santos in the back seat of the cruiser.  Santos asked if Caillot 'was going to be okay,' and the detective said that he had only been shot in the hand.  Santos told Detective McLaren that he had been driving down Warren Avenue when someone tried to highjack his vehicle.  Detective McLaren asked if Santos knew who had shot at his vehicle, and Santos replied that it was 'the same nigger that had shot, who had killed Steven.'  Santos stated that Steven was Steven Auguste, Caillot's first cousin, who had been killed three months earlier.  Santos also repeatedly blurted out, 'Six feet

under or life,' and asked Detective McLaren if he knew whether 'the other party had died.' Detective McLaren had said nothing about anyone being shot.

Meanwhile, inside the hospital, Officer Spillane spoke with Caillot, a black male, who lay on a gurney in the emergency room with his right hand heavily bandaged, and blood seeping through the bandage. Caillot was wearing a navy blue jacket, black sweatpants, and black sneakers. Officer Spillane asked him what had happened. At first, Caillot stated that he could not recall, but later stated that he had been lying in the back seat of an automobile, put his hand in the air, and got shot. He said he had no idea where it happened. Soon thereafter, State Trooper Steven Paul Godfrey arrived and advised Caillot of his Miranda rights. Caillot explained that he and Santos were in the automobile; Santos was driving. He said he was lying on the back seat of the automobile with his head behind the driver's seat, heard shooting, put his hand up in the air to pull himself up, and was shot. Caillot also spoke in the emergency room that evening with another trooper, State Police Lieutenant Michael Crisp, who knew Caillot from his previous investigation of the murder of Caillot's cousin. Lieutenant Crisp again advised Caillot of his Miranda rights, and Caillot told him essentially the same version of events, but added that earlier that evening he and Santos had been at a friend's house on Warren Avenue, and decided to go for a ride.

### B.    Procedural History[6]

After the jury verdict, Petitioner appealed his conviction and filed motions

for post-conviction relief that were denied by the trial judge. *Commonwealth v.*

---

[6] It is undisputed that Petitioner has satisfied the statute of limitations and exhaustion requirements of 28 U.S.C. § 2254. (#44 at 2-3.)

*Caillot*, 449 Mass. 712, 712 (2007) ("*Caillot I*").  In July 2001, represented by new

counsel, Caillot filed motions for post-conviction relief in the SJC.  Appellate

proceedings were stayed and the motions, by order of the full court, were

remanded to the trial court.  *Id.* at 713.  The trial court ordered discovery to be

provided to the defendant, held evidentiary hearings (#38 at 4), and granted

Petitioner's motion for a new trial based on the combined effect of two errors: 1)

that the prosecutor's argument that defendants had a motive for the murder,

namely, that they thought the victim was the same person who had killed Caillot's

cousin, was improper, and 2) that newly-discovered ballistics evidence

demonstrating that the "Brockton and State police had custody of the suspected

murder weapons and putative knowledge of the suspected continuing use of those

weapons in shootings" after Petitioner was arrested.  (#1-1 at 47.)  The

Commonwealth appealed the trial judge's ruling granting Petitioner and his

codefendant a new trial, and the SJC vacated it.  *Caillot I*, 449 Mass. at 713.

Petitioner's direct appeal recommenced.  Petitioner argued that the

admission of statements made by the codefendant to police officers violated the

Confrontation Clause of the Sixth Amendment.  *Caillot II*, 454 Mass. at 254.

Petitioner also challenged the prosecutor's closing argument on grounds that he 1)

improperly argued motive without any factual basis; 2) inaccurately stated that no

guns had been found; 3) improperly commented on Caillot's "post-arrest silence";

and 4) improperly vouched for the credibility and character of two prosecution witnesses. Petitioner also challenged the withholding of ballistics evidence: two of the guns that were used during the shootings, and police reports linking bullet casings to other crimes. Finally, Petitioner claimed ineffective assistance of counsel. The SJC rejected all of Petitioner's arguments on direct appeal on July 10, 2009. *Caillot II*, 454 Mass. at 266. Petitioner filed a timely motion for rehearing, which was also denied. Petitioner then filed a petition for certiorari to the Supreme Court of the United States, which was also denied. *Caillot v. Massachusetts*, 559 U.S. 948 (2010).

Less than six months after the denial for certiorari was entered, Petitioner filed a renewed motion for post-conviction relief with the trial court. (#38 at 6.) He asserted two errors: 1) his Sixth Amendment right to a public trial had been violated; and 2) his counsel was ineffective for failing to object and preserve the record when the public trial was denied. *Id*. This motion was denied on July 12, 2011. Petitioner then sought appellate review through a "gatekeeper petition." That petition was denied by a single justice of the SJC on February 13, 2012. *Id.*

### III. ANALYSIS

#### A.    Overview of Petitioner's Claims

Petitioner argues for habeas relief under 28 U.S.C. § 2254 because: 1) his Sixth Amendment right to confrontation was violated when his codefendant's out-

of-court statements inculpating him were admitted into evidence without the opportunity for cross-examination of the codefendant, and without any limiting instruction to the jury; 2) despite a specific defense request for such information, the prosecution failed to disclose that two of the guns used during the course of the murder were in police custody before Petitioner's trial, and failed to disclose exculpatory police reports concerning the guns; 3) Petitioner was deprived of his Sixth Amendment right to a public trial when the courtroom was closed for the entire first day of trial proceedings and Petitioner's trial counsel was ineffective for failing to object to the public trial violation; 4) Petitioner's counsel was constitutionally ineffective in several other respects; and 5) his due process rights were violated by the prosecutor's improper closing argument.

## B.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, sets out two grounds for habeas relief.  First, a federal court may grant relief with respect to a claim that was adjudicated on the merits in state court proceedings[7] if the state court decision: 1) was contrary to, or involved an

---

[7] "A matter is 'adjudicated on the merits' if there is a 'decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground.'" *Teti v. Bender,* 507 F.3d 50, 56-7 (1st Cir. 2007) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 311 (2nd Cir. 2001)).  Issues 1, 2, 4, and 5 raised by Petitioner were adjudicated on the merits (Confrontation Clause claim, *Brady* claim, ineffective assistance of trial counsel claim, and due process violation from prosecutor's closing argument claim, respectively); issue 3, where Petitioner asserts his Sixth Amendment right to a public trial was violated and trial counsel was ineffective for not objecting to that, was not adjudicated on

unreasonable application of, clearly established federal law, as determined by the

Supreme Court of the United States; or 2) was based on an unreasonable

determination of the facts in light of the evidence presented in the state court

proceeding. 28 U.S.C. § 2254(d).  A decision is "contrary to" clearly established

federal law "if the state court arrives at a conclusion opposite to that reached by

[the Supreme Court] on a question of law or if the state court decides a case

differently than [the Supreme Court] has on a set of materially indistinguishable

facts." *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000).  A decision represents an

"unreasonable application" of clearly established federal law "if the state court

identifies the correct governing principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

"Unreasonable" means that the denial of relief by the state court is "so

offensive to existing precedent, so devoid of record support, or so arbitrary, as to

indicate it is outside the universe of plausible, credible options."  *Hensley v. Roden*,

755 F.3d 724, 737 (1st Cir. 2014) (quotation marks omitted).  The Supreme Court

has said that "[a] state court's determination that a claim lacks merit precludes

---

the merits, because the SJC Single Justice denied appellate review of those claims on procedural
grounds. AEDPA's prerequisite to the application of § 2254(d) is thus satisfied here with respect
to issues 1, 2, 4, and 5.  Issue 3 is analyzed under a different rubric, set out *infra*; in brief, denial
of review under Mass. Gen. L. c. 278, § 33E is an independent and adequate state ground that
bars federal habeas review, unless Petitioner meets certain exceptions to that rule.  *Lee v.
Corsini*, 777 F.3d 46, 53-4 (1st Cir. 2015).

federal habeas relief so long as 'fairminded jurists could disagree' on the

correctness of the state court's decision." *Harrington v. Richter,* 562 U.S. 86, 101

(2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).  The

Supreme Court further explained that

> [t]his distinction creates a substantially higher threshold
> for obtaining relief than de novo review. AEDPA thus
> imposes a highly deferential standard for evaluating
> state-court rulings, and demands that state-court
> decisions be given the benefit of the doubt.

*Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks and citations

omitted) (footnote omitted).  In sum, "the purpose of AEDPA is to ensure that

federal habeas relief functions as a 'guard against extreme malfunctions in the state

criminal justice systems,' and not as a means of error correction." *Greene v.

Fisher,* __ U.S. __, 132 S. Ct. 38, 43 (2011) (citing *Harrington*, 562 U.S. at 103

(further citations omitted)).

### C.    Claims of Error by Petitioner

**1. Petitioner's Sixth Amendment right to confrontation was violated when out-of-court statements made by his codefendant, not subject to cross-examination, were offered as evidence during the trial, without any limiting instruction.**

**a. The SJC erred in deciding that some statements were admitted only to show the codefendant's state of mind, and others were harmless.**

In *Caillot II*, the SJC acknowledged that under *Bruton v. United States*, 391

U.S. 123 (1968), if a prior statement of a defendant is offered in evidence for the

truth of the matter asserted, that statement is admissible only against that defendant

and not against any codefendant, "as to whom it is inadmissible hearsay."  454

Mass. at 255.  The SJC recited the long-standing rule of *Bruton* that when the

confession of one defendant inculpates another, "the risk that a jury will disregard

a judge's instruction to consider the confession only against the confessing

defendant and not the codefendant is so great" that a limiting instruction cannot

ameliorate the prejudice to the defendant whose constitutional right of cross-

examination was violated.  *Id.*

The court went on to analyze Caillot's case under *Crawford v. Washington*,

541 U.S. 36 (2004), and *Tennessee v. Street*, 471 U.S. 409 (1985).  The SJC

observed that in *Street*, "the Supreme Court held that the confrontation clause

concerns that arise when hearsay evidence is admitted as substantive evidence

against a defendant (or when a limiting instruction to consider that substantive

evidence only against the confessing defendant may not be effective) do not arise

when the evidence is not offered for the truth of the matter asserted…".  454 Mass.

at 255.

The SJC recognized that with regard to Caillot, his codefendant's statements

"were admitted without limitation; the judge did not instruct the jury to consider

this evidence only against Santos or advise them that it was not to be considered

for the truth of the matter asserted."  *Id*. at 256.  "This would be error if these

statements reasonably could have been considered by the jury for the truth of the matter asserted and were therefore inadmissible hearsay." *Id.*

The SJC went through Santos' statements, noting that "[m]ost of what Santos said to the police – that the black male who shot Caillot's cousin had shot Caillot during an attempted carjacking of the green Chrysler Cirrus Santos was driving on Main Street or Warren Avenue – was not offered for the truth of the matter asserted but to show Santos' state of mind…". *Id.*  With regard to the carjacking account, "the Commonwealth offered these statements precisely to argue that it was a lie, concocted by Santos to explain why Caillot was shot" and why the windows in the car Santos was driving had been damaged.  *Id.*

The Court found that certain of Santos' statements, however, "were considered for the truth of the matter asserted," that is, statements to the effect that Caillot was in the car with Santos, and "that Caillot's cousin had been murdered three months earlier, and [the jury] could have considered that information against Caillot."  *Id.*  The Court found that even if the admission of these statements was error, "any error was harmless beyond a reasonable doubt."  *Id.* at 257.  The error was harmless because Caillot admitted he was in the car, and "the jury learned from the testimony of Lieutenant Crisp that Caillot's cousin had recently been murdered."  *Id.*

In his closing argument, the prosecutor vigorously argued that Caillot's motive for shooting the victim was revenge because Caillot thought the victim was the person who had murdered Caillot's cousin.  On appeal, Caillot complained that the prosecutor's closing argument was improper because there was no factual basis for this argument.  The SJC ruled that the prosecutor's argument was supported by Santos' statements to Detective McLaren that the person who had shot at him and Caillot "was the same nigger who had shot, who had killed" Caillot's cousin, and held that based on this testimony, "the jury could have found that the defendants believed that one or more of the occupants of the other car who shot at them had been involved in the murder of Caillot's cousin.  The prosecutor permissibly argued this inference that was reasonably derived from the evidence."  *Id*. at 258.

### b.   The parties' arguments regarding the Confrontation Clause.

Petitioner asserts that his Sixth Amendment right to cross-examine and confront witnesses against him and his right to due process of law, as guaranteed by the Fifth and Fourteenth Amendments, were violated when Santos' out-of-court testimonial statements were introduced against him without a limiting instruction at trial.  (#38 at 17-19.)  He claims that the SJC's legal analysis of the admission of statements by Santos was an unreasonable application of clearly established federal law, including the rules set out in *Bruton* and *Street*. (*Id.* at 27; #44 at 5 n.7.)

15

In addition, Petitioner asserts the SJC's determination of the facts was unreasonable, as its fact-finding was "internally inconsistent, self-contradictory, unsupported by the record, and wrong based on clear and convincing evidence in the record." (#38 at 22.) Specifically, in analyzing the facts of the case, the SJC erroneously "parses some words of the Santos statement as substantive and others as not substantive, something the jury was never instructed to do." *Id.* Petitioner points out the inconsistencies as follows: (1) the SJC said that Santos' statement that "the black male who shot Caillot's cousin had shot Caillot during an attempted carjacking" was offered to show Santos' state of mind, so that the government could argue to the jury that Santos was lying about the carjacking; the SJC stated that Santos' statement that "Caillot's cousin had been murdered three months earlier" could have been considered against Caillot for the truth of the matter, but was harmless; and then, when analyzing the Commonwealth's closing argument, the Court held that this same statement, which it previously characterized as being offered as a lie, provided a factual basis for the prosecutor's forceful argument concerning motive. *Id.* at 23.

Petitioner asserts that the SJC's finding that the statements were admitted for limited purposes, when in fact they were admitted without restriction, is unsupported by the factual record and is prohibited by case law, and the result was

a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *Id.* at 26-27.

Respondent counters that the SJC decision was not contrary to clearly established Supreme Court precedent, as many of Santos' statements were not offered for the truth, and Supreme Court precedent does not bar "the admission of a codefendant's statements where those statements are neither facially accusatory, nor offered for their truth (that is, where they are not hearsay)." (#41 at 24-25.) Respondent further argues that the admission of any statements that were admitted for their truth was harmless error.  *Id.*

### c.  Error was successfully preserved at trial.

"'[A] federal claimant's procedural default precludes federal habeas review… only if the last state court rendering judgment in the case rests its judgment on the procedural default.'" *Clarke v. Spencer,* 582 F.3d 135, 143 (1st Cir. 2009) (quoting *Harris v. Reed*, 489 U.S. 255, 262 (1989) (alterations in original)).  The last state court judgment here is *Caillot II*.  The SJC held that because it found any Confrontation Clause error harmless beyond a reasonable doubt, "we need not determine whether each defense counsel properly objected to the admission of the codefendant's out-of-court statements against his client or whether each made an informed strategic choice to allow the testimony because it was beneficial to his client." *Caillot II*, 454 Mass. at 257 n.8.  Caillot's counsel did

not press for a limiting instruction, and the SJC commented that his failure "may have been strategic" but again, did not make findings on this point. *Id.* As the SJC did not "rest its judgment" on the failure of counsel to preserve the issue, but decided the Confrontation Clause claim on its merits, this Court will address the claim here.[8]

### d. The right to confrontation with regard to codefendant statements is clearly established by Supreme Court precedent.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right… to be confronted with the witnesses against him." U.S. Const. amend VI. The Confrontation Clause guarantees criminal defendants

---

[8] Even though the SJC did not reach the issue of whether the errors here were preserved, Caillot's counsel clearly objected to the admission of Santos' statement that the carjacker was the same person who had killed Caillot's cousin as evidence of motive, (*see, e.g.*, Tr. 6 at 59) and the trial judge repeatedly agreed that an inference that Santos' statement established Caillot's motive would be improper. *See* Tr. 6 at 177-178 (judge says "[W]e really don't have any evidence of that kind of event"); 179 ("It's conveying information to the jury that's not in evidence and is not reliable"); 181-182 ("[W]e have to be very careful to avoid any questions that impute a motive to Mr. Caillot because of the killing of his cousin Steven").

Caillot's counsel did fail to request a limiting instruction. He moved in limine for such an instruction, but as the SJC noted, when Santos' statements were admitted he did not press for the instruction. *Caillot II*, 454 Mass. 257 n.8. After trial, Caillot's counsel filed an affidavit stating that he intended to have the statements excluded from evidence and to have the judge give a limiting instruction. (S.A. I at 1248.)

Respondent argues that Santos' statements regarding the carjacking were exculpatory (#41 at 28 n.16), but Caillot's counsel did not argue in his closing that Santos and Caillot were carjacked; rather, he stated that they were shot by the same people who shot Clermy. (Tr. 9 at 70-88.) Further, even if the carjacking account could be said to be exculpatory, the motive evidence certainly was not. And regardless of counsel's ineptitude, the lack of a limiting instruction prejudiced Caillot. *See Adamson v. Cathel*, 633 F.3d 248, 260 (3rd Cir. 2011) ("[A]s a practical matter, we do not see how [defendant's] failure to request the limiting instruction means he was not prejudiced. It may raise questions about the effectiveness of his counsel, but it does not alter the effect that the lack of a limiting instruction may have had on the jury's verdict.").

the benefit of "the principal means by which the believability of a witness and the

truth of his testimony are tested," *Davis v. Alaska*, 415 U.S. 308, 317 (1974), by

subjecting the testimony to "the crucible of cross-examination." *Crawford,* 541

U.S. at 61.

In *Crawford*, the Supreme Court explained that prior case law (specifically,

the malleable rule of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), under which hearsay

was deemed admissible if it bore a "particularized guarantee of trustworthiness")

had so twisted the legal framework supporting the Sixth Amendment that it failed

to provide meaningful protection against "even core confrontation violations."

*Crawford,* 541 U.S. at 63.  The Court held: "[w]here testimonial statements are at

issue, the only indicium of reliability sufficient to satisfy constitutional demands is

the one the Constitution actually prescribes: confrontation."  *Id.* at 69.

Accomplice statements, where the defendant has no opportunity to cross-

examine the codefendant, were excluded long before *Crawford*, under the rule of

*Bruton,* 391 U.S. at 126–28.  As stated above, the *Bruton* Court held that

statements made by a non-testifying codefendant at a joint trial that directly

inculpate a defendant are so prejudicial that limiting instructions cannot work.  *Id.*

at 135-36.  Case law after *Bruton* limited the ruling so that statements that do not

directly incriminate a codefendant, but are incriminating only when linked with

evidence introduced later at trial, can be admitted if the prejudicial impact of the

statements is not too great, (for example, if references to the codefendant are redacted), and the jury is instructed not to consider the statements against any defendant other than the declarant.  *See Richardson v. Marsh*, 481 U.S. 200, 208 (1987).  Post-*Crawford*, the First Circuit succinctly summarized the Confrontation Clause's prohibition against admission of a codefendant's statements as follows: "a defendant's out-of-court statements sometimes may be introduced at a joint trial, provided that (i) the district court instructs the jury not to consider the statements against any defendant other than the declarant and (ii) the statements are not so powerfully inculpating of the other defendants that there would be substantial doubt as to whether the jury could abide by a limiting instruction."  *United States v. Vega Molina,* 407 F.3d 511, 519 (1st Cir. 2005).

In *Crawford*, the Supreme Court noted that the Confrontation Clause does not bar the use of testimonial statements that are admitted for purposes other than establishing the truth of the matter asserted.  541 U.S. at 59 n.9.  *Street* is "the exemplar" of a case in which the admission of a codefendant's confession, not admitted for the truth asserted, was held to be proper.  *United States v. Cruz-Diaz*, 550 F.3d 169, 179 (1st Cir. 2008).  In *Street,* the respondent testified at his trial that his confession was coercively derived from an accomplice's written confession, claiming that police had shown the accomplice's confession to him and then told him to say the same thing.  The prosecutor read the accomplice's confession to the

jury in order to impeach respondent's claims, as the codefendant's confession differed from that of the respondent.  The Supreme Court explained that *Street* "is significantly different" from *Bruton*, because "the prosecutor's nonhearsay use of [the accomplice's] confession was critical to rebut respondent's testimony that his own confession was derived from [the accomplice's confession]."  *Street*, 471 U.S. at 414.  Any danger that the accomplice's statement "could have been misused by the jury" was averted because the prosecutor never asked the jury to infer that the confession proved that respondent participated in the murder, while the judge repeatedly and pointedly instructed the jury "not to consider the truthfulness of the statement in any way whatsoever."  *Id*. at 415.

While *Crawford* made clear that statements that are offered not for the truth of the matter do not implicate confrontation rights, 541 U.S at 59 n.9, *Crawford* said with equal force that one cannot solely rely on the rules of evidence to determine whether confrontation rights are triggered, *id*. at 56 n.7.  The court rejected the view "that [the Confrontation Clause's] application to out-of-court statements introduced at trial depends upon 'the law of Evidence for the time being.'"  *Id.* at 50-51 (quoting Wigmore § 1397, p. 101 (2nd ed. 1923).[9]  "Leaving

---

[9] This was not a new concept introduced in *Crawford*.  As Justice Thomas noted in his concurrence in *Williams v. Illinois*, ___U.S. ___, 132 S.Ct. 2221, 2256 (2012), even before *Crawford,* the Supreme Court did not allow the Clause's scope to be "dictated by state or federal evidentiary rules." (citing *Barber v. Page*, 390 U.S. 719, 724-25 (1968) (defining a constitutional standard for whether a witness is "unavailable for purposes of the Confrontation Clause," and

the regulation of out-of-court statements to the law of evidence would render the

Confrontation Clause powerless to prevent even the most flagrant inquisitorial

practices." *Id.*  The critical question is not whether a state or federal evidentiary

rule classifies a statement as hearsay, but whether the statement requires

confrontation because the credibility of the speaker has bearing on the probative

value of the evidence.  *Street*, 471 U.S. at 414 (confrontation right depends on need

to test credibility); *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 320, 324 (2009)

(business records exception to hearsay rule does not apply; Confrontation Clause

triggered because drug certifications are "testimony against petitioner" and

scientist who analyzes drugs can be questioned on honesty, proficiency, and

methodology, "features that are commonly the focus of cross-examination of

experts.").

The First Circuit repeatedly has recognized that under *Crawford*, rules of

evidence do not determine whether a defendant has a constitutional right of

confrontation.  *See Santiago v. O'Brien*, 628 F.3d 30, 33 (1st Cir. 2010) (noting

that although evidence falls within "some hearsay exception" under state law, the

Supreme Court may still "forbid admission in the particular circumstances" absent

a prior opportunity for cross-examination); *Cruz-Diaz*, 550 F.3d at 177 ("if the

---

*Ohio v. Roberts*, 448 U.S. at 76 (recognizing that *Barber* "explored the issue of *constitutional*
unavailability") (emphasis in original)).

government needs only to identify a non-hearsay based reason for introducing the statement it could circumvent *Crawford's* constitutional rule as well as the hearsay rule") (citing *United States v. Maher*, 454 F.3d 13, 22 (1st Cir. 2006)); *United States v. Rodriguez-Duran*, 507 F.3d 749, 769 (1st Cir. 2007) (*Crawford* provides additional protections beyond *Bruton*; even if statement can come in as to one defendant, it cannot be admitted against codefendant unless there exists independent evidentiary ground for doing so); *see also Jones v. Basinger*, 635 F.3d 1030, 1045 n.4 (7th Cir. 2011) (*Crawford* makes clear "the Sixth Amendment is not constrained by the 'vagaries of the rules of evidence'" adopted by the states) (quoting *Crawford*, 541 U.S. at 61).[10]

Another important principle concerning the admission of codefendants' statements is that Supreme Court case law dictates that the trial judge instruct the jury on how it may use such evidence.  *See, e.g.*, *Street,* 471 U.S. at 417 (where codefendant's confession read to the jury for non-hearsay purpose, "the trial judge's instructions were the appropriate way to limit the jury's use of that evidence in a manner consistent with the Confrontation Clause"); *Marsh*, 481 U.S. at 206 (where non-testifying codefendant's confession redacted to eliminate any

---

[10] For a detailed treatment of how courts misuse the non-hearsay rubric to admit evidence in violation of the Confrontation Clause, see James L. Kainen and Carrie A. Tendler, *The Case for a Constitutional Definition of Hearsay: Requiring Confrontation of Testimonial, Nonassertive Conduct and Statements Admitted to Explain an Unchallenged Investigation,* 93 Marq. L. Rev. 1415, 1426 (Summer 2010).

mention of defendant, and jury instructed not to use confession against defendant, instruction cures any potential prejudice: "Ordinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant.")

First Circuit case law confirms that Supreme Court precedent requires limiting instructions regarding codefendants' statements.  *See, e.g.*, *United States v. Figueroa-Cartagena,* 612 F.3d 69, 85 (1st Cir. 2010) (citing *Richardson*, 481 U.S. at 208, for proposition that where codefendant's confession not directly incriminating, jury is presumed to follow instructions and consider statement for proper purpose, that is, only against declarant); *Cruz-Diaz*, 550 F.3d at 177 ("where a codefendant's statement is *not* being offered to prove the truth of the matter asserted, a court may, in certain circumstances, admit the statement provided it gives a limiting instruction explaining the limited purpose the statements serves.") (emphasis in original); *Rodriguez-Duran*, 507 F.3d at 770 (where *Bruton* does not apply, case law "unambiguously requires the trial court to instruct the jury that an out-of-court confession may not be considered as evidence against the declarant's codefendants"); *Furr v. Brady*, 440 F.3d 34, 39 (1st Cir. 2006) (where non-testifying witness' statement to police that incriminated defendant was admitted not for the truth but to explain why defendant would threaten the witness, *Street* requires the trial court to determine that the statement

offered is non-hearsay and to give "a limiting instruction to that effect"); *Vega Molina,* 407 F.3d at 521 (instruction that codefendant's statement could not be considered against other defendants "should have been given" and failure to give it constituted obvious error under Supreme Court case law).

### e. Santos' statements.

Because the legal analysis that follows depends on Santos' exact statements, they will be repeated here.  Santos spoke to three officers.  Officer Thomas Spillane said that when he encountered Santos at the hospital, Santos was read his Miranda warnings, and he told Spillane that he was driving the green Chrysler Cirrus, that someone had attempted to carjack him, that someone had started shooting at him, and that he had taken his buddy to the hospital.  *Caillot II,* 454 Mass. at 249.  Officer Erin Kerr testified that she first met Santos as he was being brought out of the hospital by Officer Spillane. (Tr. 6 at 12-14.)  According to Kerr, Santos was Mirandized and handcuffed when he said "he didn't do anything but that he knows who did."  *Id.* at 15.  Kerr also testified that Santos "stated that he was car jacked."  *Id.* at 19.  After being placed in the cruiser, Santos, according to Kerr, knocked on the cruiser door and stated, "What do you think, I murdered someone?" *Id.* at 22.

Brockton Police Officer Arthur McLaren testified that at the hospital he got into the police cruiser where Santos sat, handcuffed.  Santos reiterated to McLaren

that someone had tried to hijack his car.  *Id.* at 57.  The following exchange then

took place between the prosecutor, Mr. Asci, and Officer McLaren:

| | |
|---|---|
| McLaren: | I asked him if he knew who had shot into his vehicle. |
| Asci: | And what response did he make, the exact words that he used? |
| McLaren: | The exact words? |
| Asci: | Yes. |
| McLaren: | He told me that it was the same niger [sic] that had shot, who had killed Steven. |
| Asci: | And did you ask him another question at that point? |
| McLaren: | I asked him who Steven was. |
| Asci: | And what response did he make? |
| McLaren: | He told me that Steven was Steven Auguste who had been killed three months prior. |
| Asci: | All right.  He said he was killed three months ago.  What else did he say? |
| McLaren: | He told me that it was Herby's first cousin. |
| Asci: | All right.  Did he say who killed Steven Auguste three months ago? |
| McLaren: | Yes. |
| Asci: | What did he say? |

| McLaren: | Again, he said it was the same niger [sic] that had shot into the car. |
|---|---|
| Asci: | Okay.  And did he describe a relationship between Steven Auguste and Little Herby? |

(Tr. 6 at 57-58.)

Here, both defense attorneys objected.[11]  After a long discussion out of the presence of the jury, McLaren was allowed to continue testifying:

| Asci: | Did the defendant Santos explain to you a relationship between Herbert Caillot and Steven Auguste? |
|---|---|
| McLaren: | Yes, sir, he did. |
| Asci: | What did he say during his statement to you about that relationship? |
| McLaren: | That they were first cousins. |

McLaren also said that Santos said "six feet under or life" several times; said that he had been afraid that Caillot was going to bleed to death; and asked McLaren whether "the other party had died."  (Tr. 6 at 64-66.)

### f.  Santos' statements were testimonial hearsay.

None of Santos' statements were "directly inculpatory" under *Bruton*, that is, they did not constitute a confession that implicated Caillot.  As the First Circuit

---

[11]Caillot's counsel complained that "Even though I was trying to keep it out, they got it in … He got it in that it was the same niger [sic] using his words, that killed Steven Auguste … He says it's Herby's cousin."  (Tr. 6 at 59.)

has said, however, "[O]ur conclusion that *Bruton* is inapt does not necessarily mean that there was no Sixth Amendment violation as recognized by *Crawford*." *Rodriguez-Duran*, 507 F.3d at 769 (court analyzes admission of codefendant's statement that was not "directly inculpatory" for error under *Crawford*.)  *See also Cruz-Diaz*, 550 F.3d at 178 ("A *Bruton* claim arises in a narrower set of circumstances than does a *Crawford* claim").

A Confrontation Clause analysis under *Crawford* requires two threshold determinations: (1) whether the out-of-court statements were testimonial, and (2) whether they were hearsay.  *Crawford*, 541 U.S. at 68.

### i.   Santos' statements were testimonial.

In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Supreme Court held that statements "are testimonial when the circumstances objectively indicate that there is no [] ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  Here, there was no emergency, and the statements were "made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial."  *Crawford*, 541 U.S. at 52.  Thus, all Santos' statements, "taken by police officers in the course of [custodial] interrogations," were testimonial.  *Crawford*, 541 U.S. at 52; *United States v. Cabrera-Rivera*, 583 F.3d 26, 33 (1st Cir. 2009).

###### ii.     Santos' statements were inadmissible hearsay as to Caillot.

No viable theory of admissibility for the statements was offered at trial.[12]

Some of the statements - that Santos was driving the green Cirrus, that someone

was shooting at him, and that he had taken Caillot to the hospital - even if admitted

for their truth, were harmless, as the SJC found, because Caillot told the police that

he was shot while riding in the car, and Caillot's statements properly were

admitted against him.  *Caillot II*, 454 Mass. at 256-57.  *See Vega Molina*, 407 F.3d

at 519.

Santos' statements that went to his state of mind were the centerpiece of the

prosecutor's closing argument.  Santos' question, "Did the other guy die?" which

indicated that Santos had "guilty knowledge" that the victim had been shot, was

emphasized by the prosecutor in his closing as "the most damning thing" in all the

evidence, as he argued, without limiting his argument to Santos, that this statement

proved "beyond a reasonable doubt" that *both* defendants were engaged in a

premeditated revenge killing.  (Tr. 9 at 133-145.)

---

[12] At trial the government offered Santos' statements as co-venturer statements, but as the SJC found, the statements could not have been admitted for this purpose because as Massachusetts law requires, the judge never made a finding that these statements were made in furtherance of a joint venture, or informed the jury that they must make such a finding before they could consider the statements of one joint venturer against another.  *Caillot II*, 454 Mass. 257 n.8 (citing *Commonwealth v. Nascimento*, 421 Mass. 677, 681 (1996) and cases cited).  It also bears noting that while the SJC states that Caillot was convicted as a joint venturer, *Caillot II*, 454 Mass. at 246, the jury made no findings concerning a joint venture; the verdict slip in the case states only that he was convicted of "Murder in the First Degree by Deliberate Premeditation."  (S.A. I at 80.)

Santos' further statement to Officer McLaren that the carjacker was the same

person who had killed Caillot's cousin was also used by the prosecutor in his

closing as compelling evidence against Caillot:

> So McLaren, being the good detective that he is, asks
> [Santos] the next logical question.  Who shot into your
> car?  And remember what Santos said, and excuse me for
> using this language because he uses a racial epithet, but I
> wanted to repeat it just to refresh your recollection about
> what he said.  He said, the same nigger that killed Steven
> August – that's Herby Caillot's first cousin – shot into
> the car.  He says to McLaren, the same person, the same
> black man, that killed Herby Caillot's first cousin three
> months ago was the guy that shot into the car….
>
> And isn't it convenient or coincidental or maybe just a
> random circumstance that the guy that this fellow says is
> responsible for shooting in the car is responsible for his
> first cousin's murder three months before?
>
> They had knowledge of this.  He has knowledge of it.  He
> told it to police.  And does that give them a motive to
> shoot Teriell Murphy and Carlo Clermy?  Does that
> explain the coincidence, ladies and gentlemen, why it
> was that Murphy and Clermy's homestead was shot up
> and then 15 to 25 minutes later Murphy and Clermy were
> shot at and Clermy was dead because the car driven by
> that man in which this man was in the back seat stopped
> at the corner of the street, the back door opened, and a
> fusillade of gunfire poured out into the car of the victim
> in this case?
>
> You need a motive, ladies and gentlemen? You got one
> right there.  Revenge, the oldest motive known to
> mankind.  Think about it when you deliberate.  And
> doesn't that complete the circle?  Doesn't that tell us that
> the guys in the green car who shot up 46 Winthrop Street
> are the same fellows here?  This is not a coincidence.

> This is not a happy circumstance.  It's a plan.  It's a
> design.  It was done intentionally, what does that say
> about the degree of murder in this case?

(Tr. 9 at 135.)

As the prosecutor put it, Santos' statement "gave the cops the motive for the killing of Carlo Clermy" and thus, "today you can maybe draw a logical inference that Herby Caillot got out of that car and started to blast away at the person that he may have believed was responsible for the murder of his cousin." *Id.* at 137, 142. Underscoring the importance of the motive evidence to the case, he argued: "There is a motive for this killing. He's got a good motive.  He helped him.  It's the same car, the same two guns.  That, ladies and gentlemen, is proof beyond a reasonable doubt." *Id.* at 145.

To summarize, Santos' statements were used in this way: the prosecutor argued that Santos lied to the police about being carjacked to explain why his car was damaged and why Caillot had been shot; the prosecutor then argued that Santos untruthfully reported to the police that the person who tried to carjack him was the same person who had killed Caillot's cousin; he argued that these statements demonstrated that Santos believed that Clermy, the murder victim, was the person who killed Caillot's cousin; finally, he attributed Santos' belief that the murder victim had killed Caillot's cousin to Caillot and argued that Santos' statements proved that Caillot was guilty of first-degree murder.

The SJC found that because Santos' statements were not admitted for their truth under Massachusetts evidentiary law, Caillot's confrontation rights were not triggered. *Caillot II*, 454 Mass. at 256.  This was a serious misreading of Supreme Court precedent.  As explained above, state evidentiary rules do not dictate the boundaries of a defendant's confrontation rights.  Supreme Court case law requires that a reviewing court must carefully analyze a lower court's categorization of evidence as "not for the truth."  *Street*, 471 U.S. at 413-16 (Supreme Court independently reviewed whether an out-of-court statement was introduced for its truth); *see Cruz-Diaz*, 550 F.3d at 177 (when out-of-court statement is "purportedly offered into evidence as non-hearsay," court will ask whether the "stated purpose for introducing the evidence masks an attempt to evade *Crawford* and the normal restrictions on hearsay") (citing *Maher*, 454 F.3d at 22-23).  It is not enough, as the SJC did here, simply to slot a statement into a state evidentiary rubric – "not for the truth" – and then announce that all is well.  The law requires the reviewing court to consider how the statement was used.  Here, it was used as evidence against Caillot.  *See Crawford*, 541 U.S. at 40 (noting that prosecution used the challenged out-of-court statement in closing, arguing that it was "damning evidence"); *Cabrera-Rivera*, 583 F.3d at 35 ("In any event, the government's supposedly benign purpose of introducing evidence of [the non-testifying accomplice's] out-of-court statements is belied by the use that the government made of those

statements in closing argument."); *Oscampo v. Vail,* 649 F.3d 1098, 1113 (9th Cir. 2011) (any doubt as to how jury understood out-of-court statements of codefendants "dispelled by the prosecutor's remarks at closing," where he highlighted the statements' importance in proving the defendant's guilt).

Caillot's confrontation rights depended not on a state evidentiary rule, but on whether he needed to test the credibility of the out-of-court declarant. *Street,* 471 U.S. at 414. And Santos' credibility plainly was at issue here. Santos' statements, unlike the non-hearsay statements offered in *Street,* were offered "to prove what happened at the murder scene." *Id.* Cross-examination of Santos might well have shown that the prosecutor's argument was factually wrong. Was Santos, whom the prosecution argued was making up the account of the hijacking, also making up the fact that he thought the person shooting at him was the same person who had killed Caillot's cousin? If, in fact, as the prosecutor argued, Santos' statement that the person who attempted to carjack him was the same person who killed Caillot's cousin signified that Santos thought Clermy was that person, was there any evidence that Caillot shared that belief? *See Crawford*, 541 U.S. at 66 (discussing how cross-examination could have undermined assumptions that were made about the out-of-court witness' statements). Furthermore, Santos' statements, made while he was a suspect and being questioned by police, obviously provided a reason why *Caillot* would want to shoot the victim. The Supreme Court has

recognized that this is precisely the kind of situation in which confrontation rights

are triggered. *Crawford*, 541 U.S. at 65 (non-testifying witness' statements not

reliable because she was in police custody and a potential suspect herself).  In

short, Caillot was entitled to cross-examine Santos, to "remove all the dangers that

have led courts to exclude hearsay evidence for the last three hundred years." *Lyle*

*v. Koehler*, 720 F.2d 426, 435 (6th Cir. 1983) (habeas petition allowed in part

because codefendant's letters containing false alibi were hearsay and admission of

them was violation of defendant's confrontation rights) (citing E. Morgan, *Some*

*Problems of Proof under the Anglo-American System of Litigation* 108, 142-43

(1956) (hearsay engenders risks regarding declarant's sincerity, memory,

perception, and ambiguity of intended statement)).

Aside from blindly applying a "non-hearsay" label to Santos' statements in

violation of *Crawford's* holding, the SJC also failed to acknowledge that *Street*

requires that a limiting instruction be given in a situation such as the one here.[13]

---

[13] The trial judge, troubled by the prosecutor's use of Santos' statements in his closing, did instruct the jury that with regard to the "element of motive" that had been argued "in the course of closing arguments" there was no evidence that the defendants knew the victim.  (Tr. 9 at 166-67.)  This instruction did not cure the constitutional error here.  The judge did not even specifically refer to the government's closing.  Furthermore, the instruction did not contradict the prosecutor's argument, as his argument implied that the defendants were in fact mistaken as to the identity of the victim ("So today you can maybe draw a logical inference that Herby Caillot got out of that car and started to blast away at the person that he may have believed was responsible for the murder of his cousin.").  (Tr. 9 at 142.)  In his decision allowing Caillot's motion for new trial, the trial judge recognized that the instruction was inadequate, as he stated, "… I question whether the curative instruction operated forcefully enough to neutralize the specificity and vehemence of the prosecutor's reference to motive."  (#1-1 at 56.)

The SJC's summary of the holding of *Street* is telling, where the SJC cites *Street* for the proposition that Confrontation Clause concerns do not arise when evidence is not offered for the truth of the matter asserted, without any reference to *Street's* critical requirement that the judge must instruct the jury not to use the non-hearsay evidence against the codefendant. *Caillot II*, 454 Mass. at 255.[14]  Limiting instructions are "essential to the holding in *Street*." *Adamson v. Cathel*, 633 F.3d 248, 259 (3rd Cir. 2011).  In cases decided after *Street*, the Supreme Court has reiterated the importance of limiting instructions with regard to the admission of codefendants' statements. *See Melendez-Diaz*, 557 U.S. at 314 n.4 (the "very premise" of *Gray v. Maryland,* 523 U.S. 185 (1998), is that "without limiting instructions," admission of redacted statement of codefendant that only incriminates when linked with other evidence in the case "*would have* violated the defendant's Sixth Amendment rights.") (emphasis in original).  The SJC ignored this clearly established rule.

In sum, *Crawford* holds that, regardless of state evidentiary rules, if testimony is admitted "against" a defendant, that is, testimony that proves the

---

[14] The SJC also relied on *Anderson v. United States*, 417 U.S. 211, 219 (1974), for the proposition that statements that are admitted because they are false are not hearsay. *Caillot II*, 454 Mass. at 255-56.  There are problems with *Anderson's* analysis, *see* Roger Park, *I Didn't Tell Them Anything About You: Implied Assertions as Hearsay Under the Federal Rules of Evidence*, 74 Minn. L. Rev. 783, 815 & n.175 (1990), but the primary reason why the SJC's reliance on *Anderson* fails is that the judge there gave limiting instructions, so the statements were only admitted against the defendants who made them. *Anderson*, 417 U.S. at 216-17.

government's case, the accused must be permitted to cross-examine the speaker.

*Crawford*, 541 U.S. at 68.  In certain circumstances, when the evidence is not so

prejudicial that the jury cannot be presumed to follow instructions concerning the

use of it, the trial court may instruct a jury not to consider certain evidence against

a defendant, and then it is not evidence "against" him any longer.  *See*, *e.g., Cruz v.*

*New York,* 481 U.S. 186, 190 (1987) (witness is "against" defendant for purposes

of the Confrontation Clause if his testimony is "part of the body of evidence that

the jury may consider in assessing his guilt;" if that testimony is introduced in a

joint trial with a limiting instruction it will not be considered as testimony

"against" other defendants).  In *Street*, the Supreme Court held that when an

accomplice's statements are admitted for a non-hearsay purpose, the jury must be

given clear limiting instructions, or the statements *become* hearsay.  *Street*, 471

U.S. at 413 ("If the jury had been asked to infer that [the codefendant's] confession

proved that respondent participated in the murder, then the evidence would have

been hearsay; and because [the codefendant] was not available for cross-

examination, Confrontation Clause concerns would have been implicated.");

*Melendez-Diaz*, 557 U.S. at 314 n.4.  Santos' statements were hearsay because the

prosecutor forcefully argued that Santos' statements were evidence against Caillot

and the judge never instructed the jury to consider the statements only against

Santos.

### iii.   The SJC's decision was based on an unreasonable determination of the facts.

For the above reasons, the SJC's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254 (d)(2).  The SJC's finding that Santos' statement "that the black male who shot Caillot's cousin had shot Caillot during an attempted carjacking of the green Chrysler Cirrus Santos was driving on Main Street or Warren Avenue – was not offered for the truth of the matter asserted but to show Santos's state of mind…" was clearly wrong.  There was no such limitation.  The prosecutor twisted these facts around to argue Caillot's state of mind.  The jury was not instructed to limit its consideration of the evidence to Santos' state of mind.  Under *Crawford* and *Street,* the statements were admitted for their truth against Caillot.

The SJC's analysis of Santos' statement that Caillot's cousin had been murdered, which the Court held "could have been used for the truth of the matter asserted," but was harmless because the fact that Caillot's cousin had been murdered came in through the testimony of Lieutenant Crisp, was also flawed.[15]

---

[15] At trial, defense counsel strenuously objected to Lieutenant Crisp's proffered testimony concerning the killing of Caillot's cousin insofar as it would provide evidence of Caillot's motive. The trial judge agreed that such testimony would be unfair, and specifically limited Crisp's testimony to the fact that he had met Caillot previously, "in connection with [Crisp's] investigation of the murder of his cousin."  *Id.* at 191. The trial judge instructed the prosecutor, "I don't believe you should ask him anything that would lead him to talk about the targeting question, Herby, I

The SJC's bifurcation of the part of Santos' statement in which he said that
Caillot's cousin had been murdered from the part in which he said that the
murderer of Caillot's cousin was the person who carjacked them was an
unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).  The SJC's
separate treatment of these statements ignored the fact that they were joined
together in the prosecutor's argument to enable him to argue that Caillot had a
motive for shooting the victim. (Tr. 9 at 135.)  *See Miller-El v. Cockrell,* 537 U.S.
322, 346 (2003) (state court's fact-finding process undermined where state court
ignores facts that support petitioner's claim); *Oscampo*, 649 F.3d at 1112 (state
court's failure to recognize that codefendant's statements contained "critically
important" evidence against petitioner constitutes "unreasonable determination of
facts").

The problems with the SJC's analysis are underscored by the finding that the
prosecutor's argument concerning motive was based on "evidence," namely,
Santos' statements.  Santos' statements were, in fact, used as evidence against
Caillot in the prosecutor's closing, in violation of Caillot's constitutional rights.
This was error.

---

know you and your friends have been the target of shootings.  And I think we have to be very
careful also to avoid any questions that impute a motive to Mr. Caillot because of the killing of his
cousin Steven." *Id.* at 181-82.

Finally, the SJC's findings concerning how the jury used these statements were unreasonable.  The SJC recognized that Santos' statements "were admitted without limitation; the judge did not instruct the jury to consider this evidence only against Santos or advise them that it was not to be considered for the truth of the matter asserted," and went on to acknowledge "[t]his would be error if these statements reasonably could have been considered by the jury for the truth of the matter asserted and were therefore inadmissible hearsay."  *Caillot II,* 454 Mass. at 256.  The prosecutor urged the jury to believe that Caillot shared Santos' state of mind and to use that "fact" to convict him.  The SJC's factual finding that the jury could not reasonably have considered the motive testimony "for its truth" was unreasonable.  The SJC had no way of knowing how the jury used the evidence.  *See United States v. Mehanna*, 735 F.3d 32, 47 (1st Cir. 2013) ("It is the jury's role – not that of the Court of Appeals – to choose between conflicting hypotheses, especially when such choices depend on the drawing of inferences and elusive concepts such as motive and intent.")

AEDPA allows collateral relief when a federal habeas court determines that a state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d)(2).  The determination of facts by the state court is presumed to be correct, and the applicant has the burden of rebutting the

presumption of correctness by clear and convincing evidence.  *Id.* § 2254(e)(1).

*See Hensley*, 755 F.3d at 731 (while federal court takes "closer look at a state

court's findings of fact" when considering whether a decision was based on an

unreasonable determination of the facts, "the fundamental principle of deference to

those findings still applies.").  Facts "are defined as 'basic, primary, or historical

facts:  facts in the sense of a recital of external events and the credibility of their

narrators.'"  *Sanna v. DiPaolo*, 265 F.3d 1, 7 (1st Cir. 2007) (quoting *Bryson v.*

*Ward*, 187 F.3d 1193, 1211 (10th Cir. 1999)) (citation and internal quotation marks

omitted).

Petitioner has rebutted the presumption of correctness by clear and

convincing evidence.  This is not a case, such as *Sanna*, where the trial judge made

plausible credibility findings against petitioner.  265 F.3d at 10.  *See also Coombs*

*v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000) (petitioner's claims regarding

unreasonable determination of facts "evaporates" due to state court's ruling on

voluntariness of confession, based on reasonable credibility findings).  The

erroneous fact-finding here has nothing to do with credibility.  The errors are clear

from the record.

> ### iv.    The SJC's decision was based on an unreasonable application of clearly established federal law.[16]

---

[16] There is no argument that the decision is "contrary to" clearly established federal law, which would require that the state court had reached a conclusion opposite to that reached by the

In *Williams*, the Supreme Court stated that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Court's decision but unreasonably applies that principle to the facts of the prisoner's case." 529 U.S. at 413 (O'Connor, J.). Unreasonableness is an objective standard, and an erroneous application is not necessarily an unreasonable one. *McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (citing *Williams*, 529 U.S. at 411). The First Circuit has stated that the test is whether the state court decision is "so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate it is outside the universe of plausible, credible options." *Hensley*, 755 F.3d at 737 (quotation omitted).

Here, the SJC correctly identified *Crawford* and *Street* as the controlling Supreme Court precedent but applied the rules of those cases to the facts of Caillot's case in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams,* 529 U.S. at 409). The SJC applied a state evidentiary rule to hold that out-of-court statements by a non-testifying witness, used as substantive evidence against Petitioner, did not violate the Confrontation Clause. This was in direct contradiction to the Supreme Court's holding in

---

Supreme Court on a question of law or decided a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 412-13. (O'Connor, J.).

*Crawford* that confrontation rights do not "evaporate when testimony happens to fall within some broad, modern hearsay exception."  541 U.S. at 56 n.7.

The SJC also erred in its application of *Street* when it found that it did not matter that the jury was never instructed how to use the statements.  The Supreme Court has stated that "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664.  The holding of *Street* and *Crawford*, that out-of-court statements, particularly of codefendants, must be treated with care and such statements, if they can be admitted at all, cannot be admitted without limiting instructions, are not "general rules."

Whether the SJC's decision was in error is not a "close question." *McCambridge*, 303 F.3d at 36.  "Because the testimonial out-of-court statements at issue here were offered and used for the truth of the matters asserted, their admission was improper." *Cabrera-Rivera*, 583 F.3d at 36.  Neither can the SJC's misapplication of well-established Supreme Court law concerning the Confrontation Clause be called "merely incorrect."  *McCambridge*, 303 F.3d at 36. The error "was sufficiently egregious to comprise an unreasonable application of clearly established federal principles."  *Foxworth v. St. Amand*, 570 F.3d 414, 435 (1st Cir. 2009) (citing 28 U.S.C. § 2254(d)(1)).  The outcome reached by the SJC

is "patently offensive" to the rules of *Crawford* and *Street*. *See Jones*, 635 F.3d at 1052 (admission of accomplice statements under "course of investigation" exception to hearsay rule, with no limiting instruction, was "so lacking in justification" as to constitute "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"); *Foxworth,* 570 F.3d at 435 (discussing rule of *Gray v. Maryland* and finding that "it would run afoul of clearly established Federal law to find no violation of *Gray* on these facts.").

**v.   The constitutional error had a substantial and injurious effect on the verdict.**

The SJC found that, although there was no error under *Crawford*, any error that might have occurred was "harmless beyond a reasonable doubt." *Caillot II*, 454 Mass. at 257. As explained in *Connolly v. Roden*, 752 F.3d 505, 510-11 (1st Cir. 2014), in this Circuit a court may begin its consideration of the validity of such a finding with the Supreme Court's test in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), which is that to show prejudice from a constitutional error, a habeas petitioner "must show that the error had substantial and injurious effect or influence in determining the jury's verdict." *Connolly,* 752 F.3d at 510-11. Relevant factors include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material

points, the extent of cross-examination otherwise permitted, and of course, the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).  The burden of establishing harmlessness rests with the state, and if the habeas court has "grave doubt as to harmlessness, the petitioner must win." *Foxworth*, 570 F.3d at 436 (internal quotations and citations omitted).

The admission of Santos' statements in violation of the Confrontation Clause rose to the substantial and injurious level that is required under AEDPA. First, the statements, utilized by the prosecutor, as the trial judge said, "with specificity and vehemence" to argue that Caillot had a motive for the murder. (#1-1 at 56.)  The trial judge stressed the importance of the motive evidence to the government's case in his order allowing Caillot's motion for new trial, finding that the prosecutor's argument regarding motive was "not limited to collateral issues but located close to the heart of the case."  Without the improper argument, the government was left with "a central mystery about this fatal shooting," namely, "why would two pairs of men completely unknown to each other erupt into a spontaneous and lethal gun fight in the early evening at a densely populated residential intersection?"  (#1-1 at 55.)

The evidence of motive was not cumulative.  Santos' statement provided the only evidence that Caillot had any motive for the shooting.

No cross-examination was allowed with regard to the motive evidence, as the only person who could have been cross-examined on it was Santos, who did not take the stand.

In *Street*, the Supreme Court stressed that admission of the codefendant's statement was necessary to assure "the integrity of the trial's truth-seeking function," because the defendant there argued that his confession was coerced and the only way the government could combat the argument was to resort to use of the codefendant's confession.  *Street*, 471 U.S. at 415.  *See also Jones*, 635 F.3d at 1050 (citing *Street* for authority that "asserted non-hearsay purpose" for admitting accomplice's statement must actually advance accuracy of trial's truth-seeking function).  There was no such reason to admit Santos' statements concerning motive against Caillot; he did nothing to "open the door" to such testimony.

In fact, the evidence of motive might well have undermined the "truth-seeking function" of the trial.  There was evidence, not admitted at trial, that called the accuracy of Santos' statement into question.  In his order allowing Caillot's motion for new trial, the trial judge pointed out that the prosecutor knew that Santos, in speaking to the police on the night of the incident, had identified the person whom he thought was responsible for the murder of Caillot's cousin: a man

named Buddha Coward.[17]  (#1-1 at 57.) The judge was concerned that the

prosecutor's "attribution of motive" was potentially contradicted by this fact:

> The prosecutor's rationale was that Santos may have
> believed [the victim] was Coward so that a general
> argument of vengeful motive was still permissible.
> Defense counsel viewed the reference as a deliberate
> deception of the jury.  The prosecutor's explanation for
> the reference is unpersuasive.  If the prosecution wished
> to argue that Caillot and Santos had mistaken either
> Clermy or Murphy for Buddha Coward, it had a duty to
> inform the jury of the existence of Coward.  It never did
> so."

*Id*.

With regard to the overall strength of the government's case, there was

strong evidence against Caillot.  His counsel not surprisingly conceded in his

closing that Caillot was present at the second shooting.  (Tr. 9 at 76.)  There was

evidence that the car in the first shooting resembled the car in the second.  *Caillot*

*II*, 454 Mass. at 247-48.  There was a match between the bullet casings found at the

first shooting and the bullet casings found at the second shooting, providing

compelling circumstantial evidence that the same car was at both shootings.

Teriell Murphy, the passenger in the victim's car, who testified that he chased the

assailants' car while repeatedly firing a gun at it, said that he saw the rear door of

the car open before the shooting started, and that as he got out of his car, he saw

---

[17] This man's name is spelled in several different ways in the record.

someone get into the back seat of the other car as it drove away, suggesting that the person who was shooting was the person in the back seat of the car, where Caillot admitted he was. *Id.* at 248.

In spite of these facts, the Commonwealth's case against Caillot was not overwhelming. No witness identified Caillot as an assailant. There was no physical evidence to establish that he had fired a gun. The witnesses described the assailants in vague terms. When witnesses gave more detailed descriptions, those descriptions were never matched to Caillot's appearance except in a general way.[18] There appeared to be three assailants at the first scene, none of whom was identified as Caillot. There was no evidence about where the car went in the time between the two shootings. The guns that were used in the shooting were not seized at the time Santos and Caillot were arrested, and after this incident, those guns were used in crimes that were similar to this crime. (#38 at 60-65.)

Admission of extrajudicial statements of a codefendant is particularly devastating and "powerfully incriminating." *Cabrera-Rivera,* 583 F.3d at 37. The prosecutor argued the erroneously-admitted motive evidence to establish Caillot's

---

[18] For instance, the assailants at the scene of the first shooting were described as "a black male" approximately six feet tall, wearing a black coat, a dark hoodie, blue jeans, and black boots; two men, "both dark skinned and wearing black clothing (one wearing a hoodie)," and "three males." *Caillot II*, 454 Mass. at 247-48. The only description from the second shooting was "a shadowy figure wearing dark clothing." *Id.* at 248. The descriptions of Santos and Caillot were that Santos was wearing "a dark hoodie" when he was at the hospital; Caillot was wearing "a navy blue jacket, black sweatpants, and black sneakers." *Id*. at 249, 250.

identity, intent, malice, and premeditation.  Even though the jury could have found

Caillot guilty without the offending motive evidence, the admission of it likely had

a substantial and injurious effect on the outcome of the proceedings.  At the very

least there is grave doubt.  *See Adamson,* 633 F.3d at 259 (contrary to "Supreme

Court's clearly established precedent in *Street,* which required an instruction,"

accomplice statements admitted into evidence without instruction violated clearly

established Confrontation Clause law, and petition for habeas corpus allowed); *Ray*

*v. Boatwright*, 592 F.3d 793 (7th Cir. 2010) (where prosecutor introduced non-

testifying witnesses' statements in description of interrogation of defendant

whereby he was "confronted" with accusatory statements and then his visible

reaction was gauged, and no limiting instruction given, court found confrontation

rights violated, petition allowed in *Ray v. Clements*, 700 F.3d 993, 1018 (7th Cir.

2012)); *Cabrera-Rivera*, 583 F.3d at 36-37 (in context of direct appeal, *Crawford*

violations not harmless beyond a reasonable doubt, where evidence derived from

codefendants' statements was not directly incriminating but "supplied information

not available from other witnesses").

**2. Petitioner's Fifth and Fourteenth Amendment right to due process were not violated by the prosecution's failure to turn over exculpatory evidence.**

It is undisputed that although the government was in possession of the two

guns Santos and Caillot were alleged to have used in the shootings, (referred to

here as "Gun II" and "Gun III"), the guns were not turned over to Caillot prior to

his trial.  In addition, the prosecution did not produce reports in its possession

regarding cases in which ballistics from this case matched ballistics in other cases.

Petitioner asserts that the SJC's decision in *Caillot II*, which found that there was

no due process violation from the government's failure to turn over this

information prior to trial, was an unreasonable application of clearly established

federal law and an unreasonable determination of the facts under 18 U.S.C. §

2254(d).  (#38 at 58.)

   *Brady v. Maryland*, 373 U.S. 83 (1963), was the Supreme Court's watershed

decision that articulated the government's disclosure obligations in a criminal case

under the Fifth Amendment.  *Mehanna*, 735 F.3d at 65.  "[T]he *Brady* rule

represents a limited departure from a pure adversary model.  The Supreme Court

has recognized [] that the prosecutor's role transcends that of an adversary: he 'is

the representative not of an ordinary party to a controversy, but of a sovereignty…

whose interest… in a criminal prosecution is not that it shall win a case, but that

justice shall be done.'" *United States v. Bagley*, 473 U.S. 667, 675 n.6 (1985)

(quoting *Berger v. United States,* 295 U.S. 78, 88 (1935)).  *Brady* held that "the

suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is material either to guilt or to punishment,

irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.

Since *Brady*, the Supreme Court has held that the government must disclose impeachment evidence as well as exculpatory evidence, even when there has been no request by the accused.  *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976) and *Bagley*, 473 U.S. at 676).  The rule applies to evidence "known only to police" and "the individual prosecutor has a duty to learn of any favorable evidence known to the other acting on the government's behalf."  *Strickler*, 527 U.S. at 280-81 (citing *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995)) (internal quotations omitted).

To establish a *Brady* violation, a habeas petitioner must demonstrate: (1) the evidence at issue was favorable because it was exculpatory or could have been used in impeachment; (2) the government suppressed the evidence; and (3) prejudice resulted (i.e., the suppressed evidence was material to guilt or punishment).  *Conley v. United States*, 415 F.3d 183, 188 (1st Cir. 2005).  Evidence is "material" if there is a "'reasonable probability' that, had it been disclosed, the result of the proceeding would have been different."  *Drumgold v. Callahan*, 707 F.3d 28, 38-39 (1st Cir. 2013) (citing *Bagley*, 473 U.S. at 682).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he

50

received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

For the reasons set out below, despite troubling facts concerning the evidence in question, I find that the Petitioner has not made out that the undisclosed evidence meets the standard of materiality under *Bagley*, 473 U.S. at 682, and thus that Petitioner fails to make out a *Brady* claim.

### a. The government failed to disclose firearms evidence.

The fact that the state police had Gun II and Gun III at the time of Caillot's trial was uncovered as a result of discovery ordered by the trial judge in connection with defendant's motion for post-conviction relief. *Caillot II*, 454 Mass. at 260.[19] Gun II, a nine millimeter Taurus pistol, was recovered June 3, 1998 in connection with the arrest of Joseph Watkins.[20] *Id.* Although the state police firearms identification unit test fired and documented information about this gun on June 29, 1998, several months prior to Caillot's trial, the cartridge casings found at the scene of Clermy's shooting were not matched to the gun seized in Watkins' arrest until two years later, sixteen months after Caillot's conviction, on June 16, 2000. *Id.* Cartridge casings from Gun II had, however, been linked to the shooting of

---

[19] The verdict was returned in Caillot's trial on October 5, 1998. *Caillot II*, 454 Mass. at 246.

[20] Caillot and Santos had remained in custody continuously since their arrests on November 19, 1996.

Jerry Dessalines, which took place on March 4, 1998. *Caillot I,* 449 Mass. at 723.

Dessalines had been shot twice in the head while driving on a public street.

Although Gun II was not found at the time of Dessalines' shooting, ballistics

reports linking the casings found at Dessalines' shooting and the casings found in

Petitioner's case were produced and turned over to Petitioner prior to trial. *Id.*; (Tr.

5 at 170-79.)

Gun III, a Glock nine millimeter pistol, was seized from Donald Averett on

April 10, 1998. Averett was indicted for the shooting murder on March 31, 1998

of Alexander Colon. (S.A. I at 88.) Averett was also a suspect in another drive-by

shooting that took place in Boston on April 1, 1998. *Id.* The state police test fired

the Averett gun on May 12, 1998, but it was not identified as Gun III until after

Caillot's trial. *Caillot II,* 454 Mass. at 26. As stated by the SJC, "[i]n short, the

State police had what turned out to be gun no. 2 and gun no. 3 in their custody

before the trial, but did not know it until after the jury returned their guilty

verdicts." *Id.*

In analyzing Petitioner's argument on direct appeal, the SJC correctly

identified *Brady* as the controlling Supreme Court precedent, but found that there

was no *Brady* violation because "the material information that potentially was

exculpatory - that discharged cartridge casings from the murder scene matched

discharged cartridge casings from two firearms in State police possession - was not

in possession of the prosecutor or police until after the conclusion of trial." *Caillot II*, 454 Mass. at 262-63.  The SJC reasoned that the obligations under *Brady* "impose[] no duty to gather evidence that may be potentially helpful to the defense," but instead are merely "disclosure" obligations.  *Id.* at 262.

### b.  The prosecution may have violated its disclosure obligations under *Brady*.

Petitioner argues that the SJC decision "relies upon what amounts to a 'good faith exception' whereby the prosecution has no obligation, or should suffer no consequence for its failure to recognize the exculpatory nature of evidence in its actual possession."  (#38 at 56.)  Petitioner contends that "under firmly established Supreme Court law it is the affirmative obligation of the prosecutor to learn of potential favorable or exculpatory information in the possession of law enforcement authorities."  *Id.*

Although *Brady* does not require that a defendant request exculpatory evidence, *see Strickler*, 527 U.S. at 280, ("[T]he duty to disclose evidence is applicable even though there has been no request by the accused") (citing *Agurs*, 427 U.S. at 107), in its decision, the SJC stated it would "assume, without deciding, that the defendants made a specific request for this material prior to trial."  *Caillot II,* 454 Mass. at 262 n.11.[21]  Despite the specific request, the SJC

---

[21] In fact, Caillot made an eerily specific request for this material prior to trial.  Almost one year before trial, Caillot moved for "police reports for both the Brockton Police and the State

found that there was no *Brady* violation because the police did not know the guns

in their possession were tied to Petitioner's case.

> This is not a case where the police knew they had in their
> custody a firearm that may have been used in a charged
> murder, and the prosecutor failed to disclose that fact to
> defense counsel.  Rather, this is a case where the police
> had in their custody two firearms seized in separate
> investigations, and did not learn from forensic firearms
> investigation that discharged cartridge casings from these
> firearms matched the discharged casings found at the
> murder scene until after the trial had concluded.

*Caillot II,* 454 Mass. at 262-63.

     *Brady* does not impose a duty on the government to find exculpatory

information that is not in the government's possession. *United States v. Bender*,

304 F.3d 161, 164 (1st Cir. 2002) (*Brady* did not require government to comply

with defense request to turn over evidence relative to the mental health of a witness

"regardless of where or with whom the information rested.")  The SJC assumed in

its opinion that if police do not know they have evidence, it is not "in their

possession" for *Brady* purposes.  *Caillot II*, 454 Mass. at 262-63.  Under *Brady*,

---

Police on all incidents in which 9mm .38 caliber handguns were confiscated from November 19, 1996 to the present."  (S.A. I at 613-14.)  Caillot specifically stated that "[t]he defense further believes that the police may have the murder weapons without knowing it.  The police may have confiscated the guns in an unrelated incident.  The person from whom the gun was confiscated may well be the murderer of Carlo Clermy or could lead the police to the murderer."  *Id.*  This motion was denied by the court.  *Id.*  Petitioner also joined in the pre-trial discovery motion of Santos.  That motion requested "[a]ll police reports made in connection with this case and related cases including, without limitation, all reports which relate to the discovery of ballistics information discovered at other crime or shooting scenes with links to weapons alleged to be used in the instant case." (S.A. I at 577.)

however, whether the prosecution knows that evidence exists is immaterial, as "an

inadvertent nondisclosure has the same impact on the fairness of the proceedings

as deliberate concealment." *Strickler*, 527 U.S. at 282, 288; *Kyles*, 514 U.S. at

437.  Since I find that Petitioner has not met the materiality standard under *Brady*, I

do not need to find whether the government's failure to search for the guns in spite

of a specific request was excusable, or whether the government was "willfully

blind" to "exculpatory evidence that it should well have known was available."

*United States v. Josleyn*, 206 F.3d 144, 153 n.8 (1st Cir. 2000).  *See Strickler*, 527

U.S. at 281 ("There is never a real '*Brady* violation' unless the nondisclosure was

so serious that there is a reasonable probability that the suppressed evidence would

have produced a different verdict.")  Arguably, however, particularly where the

defense had alerted the prosecution to the fact that the defense believed the guns

were in the possession of the police, the prosecutor should have made a reasonable

effort to locate them.

### c. The government's failure to disclose police reports is troubling in light of *Brady*.

Petitioner argued to the SJC that in addition to requesting that the

government search for the firearms in its possession, he also requested "access to

the police reports regarding subsequent firearms seizures involving 9 mm and .38

caliber weapons by the Brockton Police." (#38 at 66.)  Even though the SJC

acknowledged that Petitioner argued that he was denied Federal and State

constitutional rights to a fair trial by the prosecutor's failure to make timely

disclosure of material exculpatory evidence, namely Guns II and III, and "related

firearms identification reports and information," the SJC limited its analysis to the

question of whether the police and prosecution knew they had the guns in their

possession. *Caillot II,* 454 Mass. at 261.

One troubling aspect of the failure to disclose the reports about other

shootings is that at trial the prosecution specifically argued that the defense should

not be allowed to bring up the subsequent shootings. The prosecutor argued that

evidence that Gun No. II was used a year later should not be admitted because it

was "too weak in probative quality" and was not "closely related to the facts of the

case against the defendant." (Tr. 5 at 172.) The prosecutor made this argument

even though reports which showed striking similarities between the Dessalines

shooting and the shooting of Clermy, reports which were never turned over to trial

counsel, were in his possession. The prosecution continued to fight disclosure

during post-conviction proceedings. Petitioner only learned that Gun II was in the

possession of the State Police, and had been matched to shell casings in this case,

after the prosecution was forced to comply with court-ordered discovery on May

17, 2002. (S.A. I at 657.) Prior to the court-ordered discovery, the prosecution

repeatedly rebuffed Petitioner's requests for access to relevant case files.

Petitioner argues that the reports and worksheets that were not produced at trial "would have had a significant impact" on the defense.  (#38 at 60-61.)  While trial counsel knew at trial that bullet casings from Gun II matched bullet casings from the Dessalines shooting, the missing materials contained more information.  Petitioner argues that "police reports, drawings, photographs, and other documents detailing the nature of [the Dessalines] shooting incident" demonstrated that Dessalines was shot in the back and twice in the head while travelling on a street in Brockton, and that there were eight shell casings collected at the scene of the shooting.  (S.A. I at 56-57.)  As Petitioner argued to the SJC, "[t]hese detailed parallels between the Clermy and Dessalines shootings were not brought out at trial because the underlying police reports were not revealed to the defense at the time of trial.  Such evidence of a subsequent shooting under such similar circumstances, using the same weapon, when the defendants were in custody, could have been presented to show that another person may have been responsible for the death of Mr. Clermy."  *Id.*  In addition, police seized a videotape from a store located near the scene of the Dessalines shooting in the hope of identifying the individuals who left the shop before the shots were fired.  By the time of Petitioner's appeal, the videotape was lost.  *Id.*[22]

---

[22] Petitioner also argues that the reports detailing the circumstances under which Gun II was recovered would have aided Petitioner in his case.  Gun II was seized on May 3, 1998 from Joseph Watkins, a five foot eight, African American man, who weighed 135 pounds.  Watkins fit

At a minimum, all reports related to the Dessalines shooting should have been turned over to Petitioner prior to trial.  Not only did Petitioner specifically request this information,[23] but the potential exculpatory nature of these reports and the videotape is obvious.  As the Supreme Court stated in *Agurs*, 427 U.S. at 106, "[w]hen a prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable."

In *Bagley*, the Supreme Court agreed with the petitioner that "an incomplete response to a specific request not only deprives the defense of certain evidence, but also has the effect of representing to the defense that the evidence does not exist. In reliance on this misleading representation, the defendant might abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued."  473 U.S. at 682.  *See also Ferrara v. United States*, 456 F.3d 278, 293 n.11 (1st Cir. 2006) ("When the government responds incompletely to a discovery obligation, that response not only deprives the defendant of the missing evidence

---

the description of an individual seen by witnesses at the first shooting at 46 Winthrop Street. (S.A. I at 58.)

[23] Santos' Motion for Discovery specifically requested "[a]ll police reports made in connection with this case and related cases including, without limitation, all reports which relate to the discovery of ballistics information discovered at other crime or shooting scenes with links to weapons alleged to be used in the instant case."  (S.A. I at 577.)  Further, prosecutors were aware that Petitioner believed that someone else might be responsible for the shooting of Carlo Clermy, and that he believed "police may have the murder weapons without knowing it," and that he wanted police reports on all incidents in which a 9mm or .38 caliber gun was confiscated. *Id.* at 613-614.

but also has the effect of misrepresenting the nonexistence of that evidence."). The nondisclosure of the reports was a serious issue and the SJC should have addressed whether the nondisclosure of the Dessalines files constituted a *Brady* violation.

### d. The nondisclosures, while troubling, were not material.

The question is whether in the absence of the firearms and the police reports concerning other shootings, Petitioner received a fair trial. *Kyles*, 514 U.S. at 434. A defendant demonstrates a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Materiality is analyzed on the cumulative effect of the evidence. *Id*. at 440; *United States v. Sampson,* 820 F. Supp.2d 202, 230 (D. Mass. 2011).

Had Petitioner been provided with the written materials concerning other shootings, trial counsel could have cross-examined police about their failure to pursue other leads, and could have requested an adverse inference instruction based on the police failure to investigate. (S.A. I, Affidavit of Attorney Frank Mondano, at 1255-1256 ("In the event that I had been provided with access to newly-discovered information concerning firearms prior to the trial, it would have had a material impact upon the manner in which I would have conducted the defense of this case.")). Trial counsel could also have renewed the request for discovery of reports related to other shootings in Brockton in which similar

weapons were used.  Because this was a circumstantial case, evidence that there

were shootings after the arrest of the defendants in which the same weapons, in the

same neighborhood, and with the same fact pattern (victims shot in the head while

driving in a car) had the potential to sway the jury.  More important, the

prosecution was on notice to turn over this information, and yet failed to do so.[24]

In this case, while there are serious questions concerning the exculpatory

evidence that was withheld, the material withheld by the government does not

undermine confidence in the trial as a whole.  *Strickler,* 527 U.S. at 289-90; *Kyles,*

514 U.S. at 434.  As noted by the SJC in Petitioner's direct appeal, even without

the evidence, "the defendants were able to argue that the weapons were still in

circulation and that the 'real' killers had not been apprehended."  *Caillot I*, 449

Mass. at 726 (internal citation omitted).  *See generally United States v. Paladin,*

748 F.3d 438, 444 (1st Cir. 2014) (failure to disclose exculpatory impeachment

evidence is "manifestly insufficient" to undermine confidence in verdict when the

---

[24] The facts surrounding Gun III further undermine the confidence in the fairness of the trial proceedings.  Gun III was used in the shooting at 1019 Warren Avenue of Geo Neves.  Mr. Neves, the victim in the case, identified Buddha Coward as the person who shot at him.  (S.A. II at 757 n.30.)  There was evidence (not presented at trial) that Santos also believed Buddha Coward was the person who shot at him.  (S.A. I at 99; #38 at 87 ("The prosecutor knew that Santos had named another individual, Buddah Coward, as Auguste's killer;"));  Tr. 9 at 163 (judge states, "It's too big a leap, especially when we have some countervailing information that Mr. Santos may have been referring to another specific individual, Buddha Coward, whoever he might be.")).  From the beginning of the case, Petitioner argued that someone else was responsible for committing the murder.  The lack of discovery on this issue clearly harmed the defense.

value of the evidence is marginal); *Conley*, 415 F.3d at 189 (suppressed impeachment evidence is immaterial under *Brady* if the evidence is cumulative or impeaches on a collateral issue).  The evidence against Petitioner was strong and Petitioner has not shown the degree of materiality necessary under Supreme Court precedent to warrant granting his petition on this ground.

### 3. Petitioner failed to raise his challenge concerning his Sixth Amendment right to a public trial in a timely manner.

Petitioner argues that he was denied his Sixth Amendment right to a public trial because the public was excluded from the entire first day of trial proceedings, including the jury selection process.  (#38 at 67.)  Petitioner asserts that before the trial began, court officers cleared the courtroom of spectators, including Petitioner's family.  (#2 at 26, 27.)  He maintains that his family members were told they would not be allowed in the courtroom during jury selection, and they waited in the hall for the entire day.  *Id.* at 27.  On that day, not only was the jury selected, but the venire was sworn, the court described the nature of the case, and the specific charges were alleged.  *Id.*  Petitioner also argues that trial counsel's failure to object to the closure of courtroom during jury selection constituted ineffective assistance of counsel.  (#38 at 80.)  Citing the affidavit of trial counsel, Petitioner notes that the failure to object to the courtroom closure was the result of trial counsel's lack of knowledge of the applicable law.  (#38 at 82; S.A. II at 2044.)

Petitioner first raised the right to public trial and related ineffective assistance of counsel claim in his Renewed Motion for Postconviction Relief, which was filed with the trial court after his direct appeal was denied.  (#38 at 6.) That motion was denied by Superior Court Associate Justice Richard J. Chin on July 12, 2011.  *Id.*  Further appellate review was sought through a timely "gatekeeper" petition under Mass. Gen. L. c. 278, § 33E on July 29, 2011.

In capital cases, § 33E provides that "[i]f any motion is filed in the superior court after rescript, no appeal shall lie from the decision of that court upon such motion unless the appeal is allowed by a single justice of the supreme judicial court on the ground that it presents a new and substantial question which ought to be determined by the full court."  Caillot's gatekeeper petition was denied by Associate Justice Francis X. Spina on February 13, 2012. (S.A. II at 2377-78.)

Under AEDPA, a state prisoner's habeas claims may not be addressed by a federal court when "a state court [has] declined to address those claims because the prisoner had failed to meet a state procedural requirement, and the state judgment rests on independent and adequate state procedural grounds."  *Maples v. Thomas,* __ U.S. __, 132 S. Ct. 912, 922 (2012) (quoting *Walker v. Martin*, 562 U.S. 307 (2011) (internal quotation marks omitted)).  *See also Lee v. Corsini*, 777 F.3d 46, 54 (1st Cir. 2015) (state procedural rule adequate to preclude federal merits review); *Costa v. Hall*, 673 F.3d 16, 23 (1st Cir. 2012).  Under the gatekeeper

62

function, a "Single Justice's finding that a petitioner has not raised a 'new-and-substantial' question for further review constitutes a finding of procedural default under state law." *Costa,* 673 F.3d at 23; *see also Lee*, 777 F.3d at 56 ("it is only the failure to satisfy the 'new' prong of the § 33E rule that signals procedural default."). This rule applies whether the state law ground is substantive or procedural. *Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (superseded by statute on other grounds, 28 U.S.C. § 2254(b)(2)).

Section 33E has been applied by Massachusetts courts consistently, and so qualifies as "an adequate and independent bar to collateral relief." *Mendes v. Brady,* 656 F.3d 126, 130 (1st Cir. 2011); *Yeboah-Sefah v. Ficco*, 556 F.3d 53, 75 (1st Cir. 2009) (§ 33E is an independent and adequate state ground.).[25]  Justice Spina determined that Petitioner's Sixth Amendment right to a public trial, and the related ineffective assistance of counsel claim, were not "new" because they were "sufficiently developed at the time of trial, and also while his direct appeal was

---

[25] The SJC has acknowledged the "extraordinary powers" and "uniquely thorough review" that is proscribed under § 33E. *Commonwealth v. Gunter*, 459 Mass. 480, 485-86 (2011) ("'Under G.L. c. 278, § 33E, this court has extraordinary powers in reviewing capital convictions on direct appeal: we consider the whole case, both the law and the evidence, to determine whether there has been any miscarriage of justice… Unlike appellate review of conviction of other crimes, our consideration of first degree murder cases is not limited to issues based on objections rendered at trial… We are empowered under G.L. c. 278, § 33E, to consider questions raised by the defendant for the first time on appeal, or even to address issues not raised by the parties, but discovered as a result of our own independent review of the entire record….'") (quoting *Dickerson v. Attorney General*, 396 Mass. 740, 744 (1986)).

pending." (#1-1 at 77.) [26]  This determination is "tantamount to a finding of procedural default."  *Lee,* 777 F.3d at 55.  Justice Spina also found that the claims were not "substantial."  Citing *Teague v. Lane*, 489 U.S. 288, 301 (1989), Justice Spina held that Petitioner was "not entitled on collateral review to retroactive application of a 'new' constitutional rule that was first announced after his conviction became final."[27]

A state prisoner who has defaulted on a federal claim in state court pursuant to an independent and adequate state procedural rule can still get relief if the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law.  *Maples*, __ U.S. __, 132 S. Ct. at 922; *Walker*, 562 U.S. __, 131 S. Ct. at 1127; *Costa,* 673 F.3d at 25.  "Cause for a procedural default exists where 'something *external* to the petitioner, something that cannot fairly be attributed to him[,]… "impeded [his] efforts to comply with the State's procedural rule."'"  *Maples*, __ U.S. __, 132 S. Ct. at 922 (citing *Coleman,* 501

---

[26] The SJC has held that "we do look to whether the defendant raised this issue [the right to a public trial] in a timely manner because 'the right to a public trial, like other structural rights, can be waived.'" *Commonwealth v. Cohen,* 456 Mass. 94, 105-06 (2010) (quoting *Commonwealth v. Edward*, 75 Mass.App.Ct. 162, 173 (2009)).

[27] The justice's conclusion that open courtrooms during jury selection is a "new" constitutional rule and need not be applied retroactively may not be correct.  The *Presley* decision was *per curiam*, and in it the Supreme Court stated that the "Supreme Court of Georgia's affirmance contravened this Court's clear precedents."  *Presley v. Georgia*, 558 U.S. 209, 209 (2010).  However, regardless whether the right was clearly developed at the time of Petitioner's motion, this court is still barred from reviewing the gatekeeper's decision.  *See Lee*, 777 F.3d at 56 ("'a federal habeas court must accept this as a binding merits determination of newness and may not look behind the reasoning.'") (quoting *Costa,* 673 F.3d at 24 n.5).

U.S. at 753) (further citations omitted).  "Negligence on the part of the prisoner's postconviction attorney does not qualify as 'cause.'  That is so, we reasoned in *Coleman*, because the attorney is the prisoner's agent, and under 'well-settled principles of agency law,' the principal bears the risk of negligent conduct on the part of his agent." *Maples*, __ U.S. __, 132 S.Ct. at 922 (internal citation omitted). As the First Circuit has stated, a petitioner's ineffective assistance of counsel claim is not exempt from the general rule requiring cause and prejudice because to do so would "render the exhaustion requirement 'illusory.'"  *Costa*, 673 F.3d at 25 (quoting *Edwards v. Carpenter*, 529 U.S. 446, 452 (2000)).[28] Any claim of ineffectiveness must itself have been exhausted before it may be used to excuse the procedural default of another federal claim.  *Yeboah-Sefah*, 556 F.3d at 76. Because Petitioner has not shown cause for the procedural default, the court need not examine whether there was prejudice.[29]

### 4. Petitioner's Sixth Amendment right to the effective assistance of counsel was not violated.

---

[28] In *Edwards*, the Supreme Court noted that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted," but found that procedural default may *itself* be excused if the prisoner "can satisfy the cause-and-prejudice standard with respect to *that* claim."  529 U.S. at 453. In this instance, Petitioner has failed to meet the cause standard for why his appellate counsel failed to raise the ineffective assistance of counsel claim as to the Sixth Amendment right to a public trial during his direct appeal.  Without this showing, there can be no finding by this Court of cause sufficient to overcome the decision of the gatekeeper under § 33E.

[29] In this case, prejudice would be presumed, given that closure of a courtroom is considered a structural error, and therefore not subject to harmless error review. *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991).

To succeed on a Sixth Amendment claim of ineffective assistance of counsel, a defendant must establish that his "counsel's representation 'fell below an objective standard of reasonableness'" and that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Moreno-Espada v. United States*, 666 F.3d 60, 64 (1st Cir. 2012) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (further internal quotation marks and citation omitted)). Under *Strickland*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984). With regard to the performance aspect of the standard, "[t]here is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance,' and [a petitioner] 'must overcome the presumption that… the challenged action might be considered sound trial strategy.'" *Tevlin v. Spencer*, 621 F.3d 59, 66 (1st Cir. 2010) (quoting *Strickland*, 466 U.S. at 689) (further citation and internal quotation marks omitted) (third alteration in original). Accordingly, "a lawyer's performance is deficient under *Strickland* 'only where, given the facts known at the time, counsel's choice was so patently unreasonable that no competent attorney would have made it.'" *Id.* (quoting *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006)).

Under § 2254, the burden of demonstrating an ineffective assistance of counsel claim is even more difficult.  A federal court reviewing a state court's determination under *Strickland* is doubly deferential.  *Harrington*, 562 U.S. at 105 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.  If this standard is difficult to meet, that is because it is meant to be." (internal citations omitted)); *Shuman v. Spencer*, 636 F.3d 24, 31 (1st Cir. 2011) ("'The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.'") (quoting *Harrington*, 562 U.S. at 105).

### a. Petitioner alleges that his counsel failed to object to the admission of Santos' statements and failed to request a limiting jury instruction.

Petitioner asserts that trial counsel objected to the admission of Santos' statements and "did not anticipate that such testimony would be improperly admitted." (#38 at 84.)  He notes, however, that counsel "did not file a *Bruton* motion to sever his trial from the Santos trial, and failed to pursue limiting instructions regarding the Santos statements." *Id.*  He argues that "to the degree that this Court may conclude that the objections were not sufficient, then counsel should be found to be ineffective." (*Id.* at 85.)

In its decision, the SJC did not address whether defense counsel properly objected,[30] and did not specifically address Petitioner's claim in the context of ineffective assistance of counsel.  Instead the SJC stated that "any error [was] harmless beyond a reasonable doubt."  *Caillot II*, 454 Mass. at 257 n.8.

Petitioner's argument is not "fleshed out" enough to be considered here.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see also United States v. Jiminez*, 498 F.3d 82, 88 (1st Cir. 2007) (issues adverted to in a perfunctory manner are deemed waived).  At any rate, this argument is dependent on Petitioner's Confrontation Clause argument, and need not be decided.  If Petitioner succeeds on that argument, it is not necessary to consider this issue.  If he loses, the same holds true.

### b.  Petitioner's counsel was not ineffective by failing to retain a defense expert on crime scene reconstruction.

Petitioner argues that the failure to retain a defense expert on crime scene reconstruction amounted to ineffective assistance of counsel.  (#38 at 85.) According to Petitioner, the post-trial investigation of the crime scene established that the Commonwealth's version of events was not credible from a scientific

---

[30] As discussed above with regard to Petitioner's Confrontation Clause claim, ordinarily, failure to object at the time of trial would waive a petitioner's claim.  *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010) (state's contemporaneous objection rule is an independent and adequate state procedural ground that would bar review).  Since the SJC specifically did not determine whether defense counsel properly objected, this Court can consider the merits of the claim.

perspective, and that expert testimony would have been a powerful impeachment tool against the Commonwealth's chief civilian witness. (#38 at 85.) The SJC, however, endorsed the findings of the trial judge who found that at trial Petitioner was able to pursue "vigorously" the ballistics arguments that an expert would have made. *Caillot II*, 454 Mass. at 264. The SJC further found that Petitioner failed to show that the testimony of an expert "'might have accomplished something material for the defense.'" *Id.* at 265.

When an ineffective assistance of counsel claim is based on the failure to introduce certain evidence, "[i]n weighing the prejudicial effect of counsel's errors, we must consider the totality of the evidence before the judge or jury." *Stephens v. Hall*, 294 F.3d 210, 218 (1st Cir. 2002). Here, where Petitioner alleges that counsel's ineffectiveness prevented him from challenging the Commonwealth's chief civilian witness, there are three factors to consider: "first, the strength of the prosecution's case; second, the effectiveness of the defense that was presented at trial; third, the potential value of the new evidence and avenues for cross-examination 'in undermining the credibility of the government witnesses' testimony.'" *Dugas*, 506 F.3d at 9 (citing *Gonzàlez-Soberal v. United States*, 244 F. 3d 273, 278 (1st Cir. 2001)).

Petitioner has failed to demonstrate that had counsel retained an expert the result of the proceeding would have been different. As noted by the SJC, counsel

was able to argue the ballistics information in front of the jury. *Caillot II*, 454

Mass. at 265.  During closing argument, Petitioner's trial counsel attacked the

ballistics evidence presented by the prosecution.  "So one slug would have had to

go through one window, wound Mr. Caillot, and come out the other window just

facing from the rear.  I suggest to you, ladies and gentlemen, that's impossible …

[F]or the government to even argue that case they would have to bring in some

kind of physicist to explain how it could possibly have happened.  We have heard

from nobody."  (Tr. 9 at 78.)  Trial counsel for both defendants also questioned the

testimony of the Commonwealth's expert.  (Tr. 5 at 187-190; 206-209; 212-219.)

Petitioner has not shown that the results of the proceeding would have been

different had an expert been retained; thus, he cannot show that counsel's conduct

prejudiced Petitioner.  No Sixth Amendment violation occurred. Petitioner's

ineffective assistance of counsel claim should be denied.

### 5. Petitioner's rights to due process were violated by the prosecutor's closing argument on motive, but not in other respects.

Petitioner argues that the closing argument of the prosecution was improper,

prejudicial, unsupported by the evidence, and contrary to the information known to

the Commonwealth, and thus violated his right to due process.  (#38 at 86.)

Petitioner argues that the prosecutor should not have: 1) argued that the defendants

had a motive for the killing; 2) suggested that Petitioner did not act like an

innocent man; 3) vouched for the credibility of prosecution witnesses; and 4) made

the factually inaccurate argument that no guns were ever recovered.  *Id.* at 86-88.

The SJC addressed each of the arguments, and found that 1) the motive argument

was reasonably derived from the evidence; 2) that the defendant was not arrested

during the time frame in which the prosecution called into question his silence; 3)

the remarks by the prosecution about the veracity of witnesses were permissible

inferences drawn from the evidence; and 4) the prosecution did not know, nor

could it have reasonably known, that the gun statement was false. *Caillot II*, 454

Mass. at 258-260.

　　*Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) "stands for the

principle that a prosecutor's closing argument may be sufficiently prejudicial so as

to constitute a deprivation of a petitioner's due process rights." *Dagley v. Russo*,

540 F.3d 8, 16 (1st Cir. 2008) (citing *DeChristoforo*, 416 U.S. at 645).  The First

Circuit has recognized "the principle as 'clearly established federal law, as

determined by the Supreme Court." *Dagley*, 540 F.3d at 16 (citing *Olszewski v.*

*Spencer*, 466 F.3d 47, 53 (1st Cir. 2006)).

　　The Supreme Court has held that a prosecutor's comments should be

reviewed in context.  *Darden v. Wainwright*, 477 U.S. 168, 179 (1986).  Under

*Darden* the constitutional test is whether the prosecutor's alleged misconduct "'so

infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"  *Id.* at 181 (quoting *DeChristoforo*, 416 U.S. at 643).  Specifically,

courts should ask whether the prosecution's argument manipulated or misstated the evidence, whether it implicated other specific rights of the accused, and whether the objectionable content was invited by or was responsive to the summation of the defense. *Id.* at 182; *see also Lopez v. Leibach,* 13 Fed. Appx. 353, 357 (7th Cir. 2001). This is a case-specific inquiry; there is no precise federal standard governing due process claims based on a prosecutor's remarks. *Dagley*, 540 F.3d at 15 n.3; *Magraw v. Roden*, 743 F.3d 1, 9-10 (1st Cir. 2014).

Concerning the prosecutor's motive argument, it bears noting that the trial judge allowed Caillot's motion for new trial in part because the prosecutor's argument was so prejudicial. The judge noted the prosecution's attribution of motive was not only unsupported by the evidence, but was potentially contradicted by important information (the designation of Buddha Coward) that was never disclosed to the jury. (#1-1 at 55, 57.)

The theory of revenge was central to the prosecution's case. (#1-1 at 55.) *Compare Dagley*, 540 F.3d at 18 (prosecutor's remark in closing was "single, isolated and unelaborated reference."); *Magraw*, 743 F.3d at 11 (improper argument that amounted to three words in prosecutor's closing could not have prejudiced the jury.)

The prosecutor's argument attributing motive to Caillot was a purposeful misstatement of the evidence. The trial judge repeatedly told the prosecutor not to

present evidence of the revenge theory.  (Tr. 6 at 177-78 (judge says, "[W]e really don't have evidence of that kind of event"); *id*. at 179 ("It's conveying information to the jury that is not in evidence and is not reliable"); *id*. at 181-182 ("[W]e have to be very careful to avoid any questions that impute a motive to Mr. Caillot because of the killing of his cousin Steven.")).

There was no other evidence of Caillot's state of mind.  The statements regarding motive should have been limited to Santos.  As set out above, in the absence of a limiting instruction, Caillot's Confrontation Clause rights were violated when the prosecution used Santos' untested statements as if they proved Caillot's state of mind.

Caillot did nothing to "open the door" to these comments.  *Compare Fahy v. Horn,* 516 F.3d 169, 201-202 (3rd Cir. 2008) (where prosecutor's argument was in response to defense counsel's argument, defense counsel's conduct is relevant to analysis on appeal) (citing *United States v. Young*, 470 U.S. 1, 12 (1985) ("invited response" idea is not to excuse improper comments but to determine their effect on the trial as a whole)).

Given the voraciousness of the prosecution's motive argument, the harm done by the prosecutor's misconduct was not cured by the judge's instruction. The instruction did not even specifically mention the prosecutor's argument.  It did not contradict the argument, either, as the instruction merely reminded the jury that

there had been no evidence presented that Caillot and Santos knew the victim, and the prosecutor argued that Caillot and Santos might have been mistaken about whom they were shooting.  (*See* Tr. 9 at 142.)  In other words, where the prosecutor did not argue that the defendants knew the victim, the judge's instruction that there was no evidence that they knew the victim did not cure anything.  The trial court itself acknowledged the inefficacy of the argument, when in his order allowing Caillot's motion for new trial he questioned whether the "curative instruction operated forcefully enough to neutralize the specificity and vehemence of the prosecutor's reference to motive."  (#1-1 at 56.)  *Compare Dagley*, 540 F.3d at 19 (trial court provided both oral and written instructions that cured prosecutor's misstatement).

I find the prosecutorial misconduct so infected the trial with unfairness as to result in a denial of Petitioner's due process.  For this reason, I find the SJC's decision was "more than incorrect or erroneous."  *Lockyer v. Andrade*, 538 U.S. at 75-76.  It was an unreasonable application of the *DeChristoforo* fundamental unfairness standard.  Further, for the reasons set out in the analysis of the Confrontation Clause claim above, the resulting prejudice "could have affected the outcome of the case."  *Olszewski*, 466 F.3d at 59.

Petitioner has failed, however, to show that his due process rights were violated by the prosecution's comments questioning his silence. (#38 at 88.)  The

prosecution quoted the testimony of Officer Spillane in which he described his pre-Miranda conversation with Caillot.  (Tr. 2 at 164.)  The prosecution asked whether Petitioner displayed "the natural inclination [to help police]," and questioned whether he did "everything to help the police corral the person that shot him." (Tr. 9 at 132.)  Petitioner's argument is unavailing because comment on such pre-arrest silence is not prohibited under Supreme Court precedent.  *Cronin v. Commissioner of Probation*, 783 F. 3d 47, 53 (1st Cir. 2015) ("many (if not all) of these references can be reasonably understood as comments on pre-*Miranda* silence, which are not constrained by *Doyle* [*v. Ohio*, 426 U.S. 610 (1976)].").  "Unless his silence is protected by the privilege against self-incrimination…, the criminal defendant no less than any other citizen is obliged to assist the authorities."  *United States v. Caraballo-Rodriguez,* 480 F.3d 62, 72 (1st Cir. 2007) (quoting *Roberts v. United States*, 445 U.S. 552, 558 (1980) (alterations in original)).  Furthermore, the Fifth Amendment privilege against self-incrimination is not self-executing.  A defendant must invoke the right to remain silent. *Salinas v. Texas*, __ U.S. __, 133 S. Ct. 2174, 2178 (2013) (plurality opinion).[31]

---

[31] At the time of the SJC decision, there was a split among the circuits as to whether a defendant's pre-arrest silence could be used as evidence of guilt. "The courts of appeal are split as to 'whether, under some circumstances, the Fifth Amendment privilege against self-incrimination prevents the government from using a suspect's pre-arrest silence as substantive evidence of guilt.'" *United States v. Rodriguez*, 667 F. Supp. 2d 223, 227 (D. Mass. 2009) (quoting *United States v. McCann*, 366 F.3d 46, 56–57 (1st Cir. 2004) (identifying the circuit split but deciding case on other grounds), *vacated and remanded on other grounds*, 543 U.S. 1104 (2005)). Under AEDPA, a state court decision may only be overturned when it

Petitioner also argues that the prosecution improperly vouched for the credibility and character of its witnesses.  (#38 at 85.)  Petitioner does not cite to the record to support this statement.  The Court considers the argument waived. *Zannino*, 895 F.2d at 17; *see also Jiminez*, 498 F.3d at 88.

Finally, Petitioner argues that the prosecutor's statement "[t]here were no guns that were found anywhere in this case," was improper and factually inaccurate.  (#38 at 88).  For the reasons stated above in part 2, this argument may have been improper because the guns were in the prosecutor's possession. However, the argument did not rise to the level of prejudice necessary here.  "For an improper question or comment to warrant relief under AEDPA, the question or comment must have had a 'substantial and injurious effect or influence in determining the jury's verdict.'"  *Cronin*, 783 F.3d at 52-53 (quoting *Brecht*, 507 U.S. at 637).

For the foregoing reasons, Petitioner has shown that the Commonwealth's arguments violated due process.

---

unreasonably applied clearly established federal law. If Supreme Court cases "give no clear answer to the question presented," a state court's resolution of a constitutional question may not serve as a basis for habeas relief. *Wright v. Van Patten*, 552 U.S. 120, 126, (2008) (per curiam); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (lack of Supreme Court precedent bars a finding that state court "unreasonably appli[ed] clearly established Federal Law."). Thus, it could not be an unreasonable application of federal law for the SJC to have determined the prosecution's comments during closing to be proper.

## IV. CONCLUSION

For all the above reasons, I RECOMMEND that Petitioner's Petition under 28 U.S.C. § 2254 to Vacate, Set Aside, or Correct Sentence by a Person in State Custody (#1) be ALLOWED.

## V. REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603(1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ M. Page Kelley
M. Page Kelley
December 15, 2015                      United States Magistrate Judge

77